513 So.2d 471 (1987)
Fannie PARTNER, Plaintiff-Appellee,
v.
James W. ANDERSON, et al., Defendants-Appellants.
No. 18934-CA.
Court of Appeal of Louisiana, Second Circuit.
September 23, 1987.
*472 Cook, Yancey, King and Galloway by Sidney E. Cook, Jr., Shreveport, for defendants-appellants.
Gordon, Bailey & Associates by Richard S. Feinberg, Shreveport, for plaintiff-appellee.
Before HALL, C.J., and NORRIS and LINDSAY, JJ.
HALL, Chief Judge.
This is a personal injury action arising from an automobile accident. The plaintiff is Fannie M. Partner. The defendants are James W. Anderson, his employer Acid Engineering of Louisiana, Inc. and Hartford Accident and Indemnity Company.
Liability on the part of Anderson was stipulated and after a trial on the issue of damages, the district judge awarded the plaintiff $45,000.00 in general damages, $4,480.00 in lost wages, and all stipulated medical expenses except three visits to a particular doctor. Judgment was rendered for a total amount of $55,759.65. Defendants appealed seeking to reduce the awards. We amend and affirm as amended.
The Facts
The accident occurred on August 22, 1983 in Mansfield, Louisiana. Ms. Partner was stopped at an intersection pursuant to a traffic signal when a pickup truck owned by Acid Engineering and driven by Mr. Anderson collided with the rear of Ms. Partner's Monte Carlo. As a result of the force of the collision, Ms. Partner was jerked backwards and forward, striking her head on the windshield and her chest on the steering wheel. Ms. Partner did not suffer any lacerations on her head but did suffer bruises on her chest. She was conscious immediately after the impact but later lost consciousness for a period of time. Plaintiff experienced pain in her neck and back and was taken to a hospital. X-rays revealed no evidence of bone injury or fracture. She was fitted with a soft cervical collar, given muscle relaxant medication and released. Plaintiff testified that she stayed in bed at home for the next week or two.
On August 30, 1983, plaintiff began seeing Dr. Harold R. Bicknell, an orthopedic surgeon. At that time, plaintiff was complaining of pain in her neck and back. Dr. Bicknell's examination revealed tenderness, muscle spasm and some limitation on extremes of range of motion. X-rays of the lumbosacral, thoracic and cervical spine areas revealed no evidence of a bone injury. Dr. Bicknell diagnosed plaintiff as having sustained a musculoligamentous sprain to the cervical, thoracic and lumbar spine areas. He found no evidence to indicate a herniated intervertebral disc.
Plaintiff next saw Dr. Bicknell in September, 1983. No muscle spasm was present at this visit and Dr. Bicknell found no objective symptoms to support the plaintiff's complaints of pain with motion in the neck and low back areas.
Dr. Bicknell saw plaintiff four more times in 1983. During this time, plaintiff experienced improvement in her neck but continued to complain of pain in her low back area and in December, she complained of some tingling in her right leg. No muscle spasm was detected but Dr. Bicknell noted that plaintiff experienced some discomfort with extremes of motion. He prescribed a lumbosacral support and plaintiff later reported improvement in her lower back pain as a result. Plaintiff's neurological exam was normal. Dr. Bicknell felt that during this time plaintiff was somewhat improved from her initial visit but due to her continued complaints of pain he hospitalized her for one week in January, 1984 for traction and physical therapy. Dr. Bicknell felt that plaintiff's condition was improved as a result of the hospitalization and that she was having less pain and discomfort.
On February 6, 1984, plaintiff reported to Dr. Bicknell that she was improved.
*473 She stated that she was working as a beautician. At the time of the accident, Ms. Partner supplemented her regular income from her job at a day care center with part-time weekend work as a beautician. Plaintiff continued to complain of tenderness in her neck and back. However, Dr. Bicknell felt that she had improved enough by March 5, 1984 to return to her regular full-time occupation of day care worker. He felt that if she were cautious, she would be able to perform the duties of a day care worker without aggravating her back condition. On March 30, plaintiff stated that she was improved. Dr. Bicknell's exam of the lumbar spine revealed minimal tenderness with no palpable muscle spasm in the area. He noted that Ms. Partner was able to carry the lumbar spine through a full range of active and passive motion with minimal discomfort. He felt that she was progressing satisfactorily. She was to return only if there was additional difficulty. Dr. Bicknell noted that she had experienced some total temporary disability following the accident and would have some pain and discomfort in the low back area for a period of time but that she was able to return to her employment.
In May, 1984, plaintiff continued to complain of pain in the lower back but Dr. Bicknell did not think she was any worse. He next saw her for a complaint related to the accident six months later in November, 1984. At that time plaintiff was complaining of pain in the lower back with some radiation to the lower extremities. No muscle spasm was evident. X-rays of the lumbosacral spine revealed a slight narrowing at the L5-S1 interspace but no other degenerative changes were noted. Dr. Bicknell indicated however that a slight narrowing at this interspace can be a normal occurrence and expressed doubt that a trauma would have caused a narrowing of the interspace at this time. He also pointed out that this narrowing did not necessarily mean that the patient had degenerative changes because some people normally have a slight narrowing at that interspace.
At three subsequent visits, March and November, 1985 and January, 1986, plaintiff continued to complain of low back pain. Dr. Bicknell characterized plaintiff's level of pain over her course of treatment as moderate stating that it certainly was not severe or excruciating. He noted that based on his initial findings, plaintiff should have improved and that she had complained of pain for a longer period than would normally be expected. Dr. Bicknell's prognosis was that plaintiff should improve and get better with time. He could not say how long she might continue to have pain. He thought she needs to be careful about her activity, particularly in lifting.
He stated that plaintiff might have some pain and discomfort in the back with excessive amounts of bending or heavy lifting but that ordinary activity without excessive strain to the area should not cause her any undue problems.
Dr. Bicknell admitted that based on the American Medical Association guidelines for orthopedic surgeons and the extent of plaintiff's limitation of motion following the injury, plaintiff does not have a disability. However, he stated, "I felt that due to the musculoligamentous problems that she had that she deserved a disability estimate." He stated that she might have as much as five percent permanent residual disability of the body as a whole as the result of her injury to her neck and low back and her continued difficulty in that region. He further noted that the limitation of motions at extremes of motion was based on plaintiff's complaints and was not an actual limitation of motion due to any bone abnormality.
In October, 1983, approximately six weeks after the accident, plaintiff was examined by Dr. Donald R. Smith, a neurosurgeon. He found no objective evidence of any abnormality and felt that her exam was essentially completely normal. On the basis of plaintiff's history, Dr. Smith felt that she had suffered a lower back strain, and possibly a cervical strain also, which had either completely resolved or was in its last stages of resolution. He stated that if a patient where in active pain he would have expected to encounter abnormal findings during his exam to substantiate the *474 patient's complaints of pain. He found no such objective evidence of any abnormality during plaintiff's exam. While plaintiff's range of motion was mildly limited, he noted that range of motion limitations can be caused by other things besides a mechanical difficulty in the joints of the back itself. He noted that plaintiff was obese and that this could cause range of motion limitations.
Dr. Smith felt that plaintiff was not disabled when he saw her, that she would be able to return to her former activities as a day care center worker and would suffer no permanent disability. He stated that cervical or lumbar strains usually resolve with time.
Plaintiff was examined by Dr. Baer I. Rambach, an orthopedic surgeon, on April 19, 1984, approximately eight months after the accident. In his opinion, plaintiff's objective physical findings were very minimal. On the basis of plaintiff's history he felt that she had sustained a myoligamentous strain to the cervical and lumbosacral spine regions but she had had ample time to recover. He could find no indication of any permanent residual disability and stated that plaintiff would not be entitled to a disability rating under either the American Medical Association or the American Academy of Orthopedic Surgeons guidelines. He found a normal range of motion in the lower part of the back and no muscle spasm. X-rays of the area were normal. He felt that plaintiff should be able to resume all her regular activities and would not be left with any permanent disability. He felt that she should have no problems with the bending, stooping or lifting she would need to do at the day care center if she rehabilitated her musculature with exercises and maintained a good exercise program. He did not diagnosis fibromyositis and disagreed with a diagnosis of this condition in plaintiff.
Plaintiff began seeing Dr. Larry K. Broadwell, a rheumatologist, in December, 1984, approximately 15 months after the accident. At that time Dr. Broadwell noted tenderness in the neck, lower back and hip muscles of the plaintiff but no evidence of muscle spasm. He prescribed an exercise program for plaintiff. After reviewing the x-rays taken by Dr. Bicknell, he noted a mild narrowing of the lower disc in her back but felt that it was not of too much consequence. Dr. Broadwell diagnosed plaintiff as having chronic cervical and lumbar strain but he did not feel that plaintiff's symptoms warranted a diagnosis of fibromyositis.
In February, 1985, plaintiff's condition was the same. Dr. Broadwell noted that the plaintiff had not been doing her back exercises on a regular basis. At subsequent visits in April, June and August of 1985, Dr. Broadwell noted continued improvement in plaintiff's condition. At that time, he explained to plaintiff how to perform her tasks at the day care center without straining her neck or back.
Dr. Broadwell next saw plaintiff in November, 1985. At that time she was a little bit worse but still improved from her initial visit to him. Plaintiff had started back to work at the day care center. He noted that she said this did not cause any significant increase in pain.
In January, 1986, Dr. Broadwell noted that plaintiff's neck had improved but her back was a little bit worse. He attributed this worsening to her work at the day care center. He noted that the manner in which plaintiff was performing her tasks at work and her being overweight would have had a tendency to aggravate her back condition.
Dr. Broadwell's prognosis was that plaintiff would continue to have pain in her neck and back but that if she continued with exercise, medication and posture requirements she should have more good days than bad days. He characterized plaintiff's complaints of pain as moderate and estimated a five percent disability. He stated that her condition was chronic and would persist with continued pain in her neck and back, causing some limitation in her activities, but he admitted that, except for lifting children who weigh in excess of 25 pounds, she would be able to perform every task required of a helper in a child care center.
The plaintiff was seen twice by Dr. Christopher D. Burda, a rheumatologist.
*475 The first visit was in December, 1985. Dr. Burda found that the plaintiff's range of motion was slightly limited in the lumbar spine and that the plaintiff had multiple tender points. He diagnosed traumatic fibromyositis, a soft tissue rheumatic syndrome characterized by pain, muscle spasm and tender points.
Plaintiff's condition was essentially unchanged at the second visit in January, 1986 and Dr. Burda assessed a three to five percent disability rating to the plaintiff using the American Academy of Orthopedics guideline. His determination was based on physical findings of spasm, tender points, loss of the lumbar curve and some evidence of a narrowing disc. He admitted, however, that a degenerative disc may occur naturally and that he could not say that this narrowing was caused by the accident. Dr. Burda testified that the plaintiff has a good prognosis even though she still has pain and limitation of movement of the lumbar spine.
Plaintiff first saw Dr. Joe B. Hayes, a psychiatrist, in March, 1984, approximately six months after the accident. He diagnosed her as having post traumatic depression and some of the symptoms of post traumatic stress disorder. Plaintiff's emotional symptoms at this time included nightmares, fear of driving a car, worry about financial problems, crying with the least stress, withdrawal from friends and irritability with her family. Additionally, back pain interfered with plaintiff's sleep and sexual activity. She saw him regularly from April to July, 1984. She showed progressive improvement during this time and in his opinion she had a favorable prognosis. She was also improved in September, 1984. In November, 1984, Dr. Hayes noted that Ms. Partner was making her complaint of pain less important emotionally. Dr. Hayes saw Ms. Partner four times in 1985. Dr. Hayes noted that Ms. Partner's withdrawal problems improved when she enrolled in vocational school and that many of her post traumatic stress syndrome symptons had cleared up. She was no longer reporting nightmares, was driving with success, was involved with people, including family members, with less discomfort. He noted that she had responded positively to therapy, had shown progressive improvement and had a favorable prognosis. He did not foresee any reason why she should have any significant emotional symptoms in the future or any permanent disability at all if she continues to work in a positive direction. He did not anticipate that she would need to continue seeing him on an indefinite basis.
Plaintiff was examined in December, 1985 by Dr. Paul D. Ware, a clinical professor of behavioral medicine. He conducted a complete psychiatric and neurological evaluation. Dr. Ware testified that when he saw plaintiff she had absolutely no symptoms of depression, nor did he find any evidence of distress or psychiatric disease. The plaintiff had returned to work and was not experiencing any difficulty driving or sleeping. He disagreed with Dr. Hayes' diagnosis of post traumatic depression and would not have made a diagnosis of clinical depression based on what Dr. Hayes described to be plaintiff's symptoms. Based on Dr. Hayes' description he would have made a diagnosis of possible mild post traumatic stress syndrome but this syndrome was not present when he saw her. He noted that this syndrome is either delayed or chronic and is not characterized by exacerbations and remissions.
Dr. Ware testified that plaintiff's neurological exam was essentially normal except she had some decreased motion on straight leg raising test in her right leg. He found no muscle spasm in this area and he did not find anything suggesting that plaintiff had fibromyositis.
Ms. Partner testified that at the time of trial, she continued to experience pain in her lower back, numbness in her leg, occasional pain and stiffness in her neck and occasional headaches. She stated that she could not bend, sit or stand too long without suffering back pain. She said she still could not do housework or yardwork nor could she dance, jog or exercise. She could not engage in sexual activity due to her back pain. Ms. Partner testified that she was still taking pain medication and was *476 still seeing Drs. Bicknell, Broadwell and Burda on an as needed basis.
Ms. Partner also testified that while her emotional state had improved, she still cried, was depressed occasionally and felt irritable because of her pain.
Trial Court Findings
The trial judge specifically found that Ms. Partner was not a malingerer and that she had sustained a permanent injury to her mid and lower back muscles. He concluded that she was approximately five percent permanently disabled as a result of her injuries. In reaching this conclusion the court gave significant weight to the testimony of Ms. Partner's attending physicians, Drs. Bicknell, Burda and Broadwell. The court also noted that both Ms. Partner and other members of her family who testified were honest and consistent. The court accepted as true Ms. Partner's testimony regarding her continued pain and discomfort.
The trial judge noted that as a result of the accident, Ms. Partner experienced increased nervousness, especially related to driving, depression, inappropriate crying, withdrawal from her family and nightmares. He concluded that these symptoms were understandable given the debilitating nature of her injuries, the adverse affect on her income, and her pain, which limited her normal activities including her sex life.
General Damages
Defendant claims that the trial court erred in awarding $45,000.00 in general damages.
Before a trial court award may be questioned as inadequate or excessive, the reviewing court must look first, not to prior awards, but to the individual circumstances of the present case. Only after analysis of the facts and circumstances peculiar to the case and the individual, may a reviewing court determine that an award is excessive. Reck v. Stevens, 373 So.2d 498 (La.1979). The appropriate procedure for testing whether the trial court abused its discretion is to determine whether the award can be supported under the interpretation of the evidence most favorable to the plaintiff which reasonably could have been made by the trial court. Schexnayder v. Carpenter, 346 So.2d 196 (La.1977).
Applying the foregoing legal principals after a careful review of the record, we conclude that the trier of fact, although generally correct in its factual findings, abused its discretion in making the general damage award.
Even assuming that Ms. Partner is five percent permanently disabled, we find that the award was unreasonably excessive. The evidence, as articulated in a light most favorable to Ms. Partner, shows that she suffered a moderate cervical and lumbar strain. None of her doctors ever intimated that she endured extreme pain or suffering and several doctors found that she had no permanent disability at all. Secondarily, Ms. Partner experienced stress and depression as a result of the accident. However, she received treatment and progressively improved. Both psychiatrists agreed that she would not have any permanent emotional problems as a result of the accident.
At time of trial, Ms. Partner had been treated by four physicians for about 2½ years. During this time she continued to have pain in the neck and lower back areas. She was required on various occasions to wear a neck collar and a back brace. She wears the back brace which is tighter than a girdle every night while sleeping. Her treating physicians believed her pain to be real, and that it would persist in the future. Ms. Partner is restricted in the activities she can do at home and at work. Her work at a day care center aggravates her condition. The effect of the moderate neck and back sprains on this particular person has been long-standing and has resulted in some disability that will continue in the future. Her treating physicians believed her complaints to be real and the trial court was impressed with the plaintiff's testimony.
Still, plaintiff's pain has been and is moderate. Her disability is relatively minor; she has continued to work and to do many activities. She will have good days and bad days. Although aggravating, her injury cannot be said to be severe.
*477 Accepting the evidence in the light most favorable to the plaintiff, as did the trial court, we nevertheless find the $45,000.00 award for general damages to be excessive.
Once it has been determined that the trier of fact has abused its discretion in making its award, the appellate court can amend the award. However, in doing so it is limited to lowering (or raising) it to the highest (or lowest) point which is reasonably within the discretion of the trial court. Coco v. Winston, 341 So.2d 332 (La.1976). We find that the highest reasonable amount which could be awarded as general damages in this case is $30,000.00.
Lost Wages
Defendant contends that the trial court erred in awarding $4,480.00 in lost wages.
The trial judge did not give reasons for how he arrived at this figure, but the plaintiff testified that at the time of the accident she was earning $4.00 per hour for a 40 hour week or $640 per month. This testimony was uncontroverted. Apparently the trial judge found that Ms. Partner was absent from work for approximately seven months and based his award on this amount of time ($640.00 × 7 = $4,480.00). When a claim for lost wages cannot be proved with mathematical certainty, it can be estimated by any proof that reasonably establishes the claim, including the plaintiff's testimony alone, if accepted as truthful. Jordan v. Travelers Insurance Company, 257 La. 995, 245 So.2d 151 (1971). Apparently the trial judge chose to accept Ms. Partner's testimony on the issue of lost wages. We find no abuse of discretion.
Defendant also contends that the trial court erred in admitting plaintiff's Exhibit "F", a statement from the plaintiff's employer regarding her lost wages. Given that the plaintiff's testimony alone is sufficient to prove lost wages, we find that the admission of this exhibit was harmless error.
Decree
Accordingly, and for the foregoing reasons, the judgment appealed from is amended to reduce the principal amount thereof from $55,759.65 to $40,759.65. As amended the judgment is affirmed with costs of this appeal to be divided equally between appellee and appellants.
AMENDED AND AS AMENDED, AFFIRMED.