638 So.2d 467 (1994)
Sheldon M. FLEMING
v.
Thomas SMITH, et al.
No. 93-CA-488.
Court of Appeal of Louisiana, Fifth Circuit.
May 31, 1994.
*468 Chester A. Fleming, III, New Orleans, for plaintiff/appellee, Sheldon M. Fleming.
Richard L. Edrington, LaPlace, for defendant/appellant, Allstate Ins. Co. and Thomas Smith.
Thomas J. Miller, Metairie, for defendant/appellant, Ormond Country Club & Aetna Cas. and Sur. Co.
Before BOWES and CANNELLA, JJ., and JOHN C. BOUTALL, J. Pro Tem.
BOWES, Judge.
Defendants/appellants, Ormond Country Club ("Ormond"), with its insurer, Aetna Casualty and Surety Company ("Aetna"), and Thomas Smith ("Smith") with his insurer Allstate Insurance Company ("Allstate"), appeal a judgment of the district court which granted additur to a jury verdict in favor of plaintiff Sheldon Fleming ("Fleming"). Fleming has answered the appeal. We affirm the judgment as follows.

FACTS
Fleming was injured at Ormond on May 18, 1989 while walking on a sidewalk between the pro shop and the parking lot for the golf carts. A cart, operated by defendant, Smith, backed into Fleming and struck him down, causing serious injury to both legs. Fleming was taken to River Parishes Hospital where he was treated for a broken fibula in his right leg, and released. Fleming consulted an orthopedic surgeon, Dr. David Aiken, who treated him for the broken bone and other injuries, including torn cartilage in his left knee. Fleming was able to return to limited work by July, 1989, and by September he resumed normal employment activities. Suit was filed, wherein it was alleged by Fleming that Smith was negligent in, among other things, failing to maintain proper lookout, failing to maintain proper control of the vehicle, and driving at an unsafe speed. Ormond was allegedly negligent in (among other things) failing to supervise safe operation of the golf carts, failing to safely design the parking lot, and sidewalk, failing to provide proper warnings, failing to provide and enforce regulations regarding proper use of golf carts, etc. Smith filed a cross-claim against Fleming and Ormond. In turn, Ormond filed a third-party demand against architects Pelias, Thienaman, and Pershall alleging negligent design; and further filed a cross-claim against Smith. The demands against the architects were dismissed prior to trial.
The case was tried before a jury in October, 1991. At the trial, the jury found that Smith and Ormond were negligent in the ratio of 90% and 10%, respectively. They awarded the following damages:

*469
Past, present and future physical
pain and suffering $ 5,000.00
Past, present and future mental anguish $ 2,500.00
Past, present and future permanent
partial disability/loss of enjoyment of
life $25,000.00
Medical expenses, past present and
future $ 6,800.00
Past lost wages $10,000.00
Loss of earning capacity/future lost
wages -0-
 __________
 TOTAL DAMAGES $49,300.00
 ==========

Fleming filed a post verdict motion for judgment notwithstanding the verdict as to damages only, and alternative motions for new trial (as to damages) and for additur. The trial court denied the JNOV, but granted the new trial as to damages and, alternatively, gave the defendants 15 days to give written consent to an additur of $27,500.00. This consisted of an additional $20,000.00 for past lost wages, which the court found totalled $30,000.00; and an increase in general damages of $7,500.00 to a total of $40,000.00. The defendants accepted additur under protest and judgment in favor of Fleming was granted in the amount of $76,800.00.[1] The percentages of negligence against the separate defendants were maintained.
Ormond has appealed the additur and the award of costs to plaintiff for a deposition not used at trial. However, in its brief, Ormond makes no complaint regarding the percentage of fault found in their action or inaction. Smith has also appealed the additur, as well as the determination of fault percentage assessed against him. Fleming answered these appeals, requesting an increase in damages in all categories.

TRIAL
At trial, testimony indicated that Fleming was a 31 year old insurance catastrophe adjuster whose job it was to appraise damages on behalf of property owners. He was paid based on the amount of claims worked on, and the amount of damage claimed. Fleming was scheduled to leave on a job in Dallas three days after the accident. He testified that on the day of the accident, he was walking on the sidewalk toward the clubhouse when he heard a group of women yelling: "... apparently they saw the cart backing out that was going to hit me and hollered. And as soon as they hollered, I went to turn ... and as soon as that instant (snapped fingers), that's when the cart hit me and jammed me up against these bushes...".
Fleming was hit from the back and had no opportunity to avoid the accident. He testified that his right leg was put in a cast, and then following arthroscopy on his left knee, was on crutches until July. He was unable to work at all during that time. After the doctor released him to return to work, in the first week in July, he was able to work on an inside/office basis. He could not climb on roofs, ladders, etc., as would be required on his regular duties, until September, and then, when he did climb he was still sore. At the end of 1989/90, some eight and one-half months later, he was able to do an adjusting job in the Virgin Islands and Puerto Rico. During this time his knee and back continued to hurt him.
Fleming testified that before the accident, he was active. In addition to golf, he played tennis, and occasionally played racquet ball; he did regular weight lifting and some jogging. While he can still perform these activities, he does so on a more limited basis; he can no longer play racquetball, jog or lift weights without pain. However, he still maintains his occupation as a catastrophe claims adjuster.
With regard to income, plaintiff testified that he was unable to keep a job assignment in Dallas in May and June to handle catastrophic claims adjustments due to the accident. When asked the rate of pay for that particular job, plaintiff replied:
A. On a catastrophe, on an outside catastrophe claim, you can work six days a week. And it's by the number of claims that you go on a day; and hail storms, *470 you can go on ten a day easily. And it's about $1,000 a day.
Q. A thousand dollars a day for six days a week for six weeks?
A. Right.
Fleming also testified that while working inside, during most of July through August, 1989, he earned between $1,500.00 and $1,700.00 per week. After that he resumed his regular job at his regular rates. His 1989 W-2 form, submitted into evidence, shows income from commissions for 1989 of $22,886.55, plus $9,443.75 miscellaneous income. His W-2 form for the following year of 1990 showed income of $117,766.50.
With regard to active employment prior to the accident, the only evidence was the testimony of Fleming that in 1980-81, he marketed "home protection plans"; he then worked as a manager for an insurance company through 1985, and then operated a construction company which was still in business through 1989 (although no houses were built after 1986). After that Fleming began his career as a catastrophe claims adjuster. No testimony was elicited, nor evidence produced, of how long Fleming worked for Crawford in 1989 and it is unclear from the record whether the W-2 form represented plaintiff's entire 1989 income. Further, there is absolutely no evidence as to his income prior to 1989.
Smith testified that on the date of the accident, he arrived at Ormond to join a group of friends for a golf game. Due to a golf tournament earlier in the day, the golf carts were arranged helter-skelter, in no organized fashion, with the exception of two or three carts still lined up that had not been out. He got into one of the unused carts, and started to move it out when he realized that one of the return carts was in the way. Intending to move the return cart, which was already on the pedestrian sidewalk, he got into it from the passenger side and put it in reverse. He could reach the pedals with his left foot and the steering wheel with his left hand. He looked back before he hit the accelerator but did not see Fleming before he was hit.
Smith stated that he believed that one of the spikes on his shoe caught on the edge of the brake, and though he thought he had his foot on the brake, it was still on the accelerator. He did not give a warning that he was backing up. He admitted that if he had taken time to sit in the driver's seat to move the cart, he would probably not have missed the brake pedal.
Dr. David Aiken, plaintiff's treating physician, testified that Fleming consulted him on May 22, 1989, four days after the accident. Fleming had stated that following the accident, he was X-rayed at an emergency room and found to have a fracture or broken bone in his right leg. He complained that after the accident, he began to notice constant low back pain, aggravated by activity. Dr. Aiken also X-rayed the leg and reaffirmed that plaintiff had fractured the fibula bone in his right leg just above the ankle. The leg was placed in a cast. Dr. Aiken also diagnosed that Fleming had a sprained muscle in his lower back and a torn cartilage in his left knee. At that time, in addition to the leg cast, rest was prescribed.
Several weeks later, after continued complaints, Dr. Aiken recommended and performed an arthroscopy of Fleming's left knee to remove the torn cartilage. To do this Fleming underwent general anesthesia in outpatient surgery. There were three stitches where the arthroscope was inserted. Plaintiff recovered well from the surgery, although pain and swelling necessitated anti-inflammatory medication. By July 7, he was released to return to work, since he was able to work and still limit his physical activities. By July 18, 1989, he was released for full work. Although the fracture had not completely healed, the right leg felt fine. In August, about three months after the accident, he still complained of low back problems and left knee pain.
Almost one year later, Fleming returned to Dr. Aiken. His main complaint was a swelling of the left knee which prevented him from several activities such as running and which sometimes "popped"; and his low back pain continued. His right ankle was sore with running. Dr. Aiken recommended Mr. Fleming consider another arthroscopy. On *471 November of 1990, Dr. Aiken again recommended the procedure which plaintiff has continued to decline.
With regard to his lower back, Dr. Aiken ordered an MRI, the results of which were within normal limits.
Ultimately, Dr. Aiken determined that plaintiff has a whole body impairment of about 10%consisting of 3-5% due to chronic lumbar sprain and 6% due to the continuing knee problem. He opined that plaintiff probably still has additional torn cartilage in that knee, which injury usually progresses to arthritis. Plaintiff may elect to have a total knee replacement somewhere in the future after age 50. His chances for needing such surgery were dramatically increased as a result of the injuries in this accident. Dr. Aiken estimated that a second arthroscopy would cost $4,500.00 and the knee replacement about $15,000.00.
Samuel Farnet, an architect, testified for the plaintiff. Although he had designed different types of structures such as hotels, he had never designed a golf course or country club. In his opinion, the placement of the golf cart storage area on a paved surface at the same elevation as the sidewalk, with no separation or barrier to protect the sidewalk or pedestrians, was unsafe. Doorways which swing open onto the sidewalk could obstruct the view of a pedestrian and prevent him from seeing an oncoming golf cart on the (dual purpose) sidewalk. Farnet suggested a planted area of bushes, or posts to separate the golf cart parking from the sidewalk, and that such improvement would cost about $1,500.00. He admitted, however, that there were no national or standard building codes that would require such changes, and that Ormond did not fall below any written building standards.
Leonard Quick, a civil engineer called by Ormond, testified that the golf cart/sidewalk area in question conformed to parish codal requirements and industry standards. Ormond was favorably compared with two other country club/golf courses which were of similar design, and in Quick's opinion, none of them presented unsafe conditions. Quick stated that the sidewalk in question was extra-wide to accommodate the joint usage of pedestrians and golf carts, and such joint usage in these clubs was not unexpected.
Gregory Core, interim general manager and director of activities at Ormond on the date of the accident, testified that no other claims for similar accidents such as the present one had been made. However, there had been complaints about the danger to sidewalk pedestrians from the golf carts. In response, Ormond painted yellow lines in the entrance areas to the locker rooms as warnings. There were employees whose duties were to return the used golf carts to the shed for recharging, and arrange the charged carts conveniently near the clubhouse.

ANALYSIS
The applicable law with regard to our standard of review is as follows:
LSA-C.C.P. art. 1814:
Remittitur or additur as alternative to new trial; reformation of verdict
If the trial court is of the opinion that the verdict is so excessive or inadequate that a new trial should be granted for that reason only, it may indicate to the party or his attorney within what time he may enter a remittitur or additur. This remittitur or additur is to be entered only with the consent of the plaintiff or the defendant as the case may be, as an alternative to a new trial, and is to be entered only if the issue of quantum is clearly and fairly separable from other issues in the case. If a remittitur or additur is entered, then the court shall reform the jury verdict or judgment in accordance therewith.
LSA-C.C.P. art. 2083(B) gives the standard of review thus: "In reviewing a judgment reformed in accordance with a remittitur or additur, the court shall consider the reasonableness of the underlying jury verdict."
In discussing the above amendment to C.C.P. art. 2083, the Third Circuit has stated:
In Lougon v. Era Aviation, Inc., 609 So.2d 330 (La.App. 3d Cir.1992), we recently recognized that this amendment legislatively overrules prior jurisprudence in *472 this circuit which held that the jury award was not to be considered in the appellate review of a judgment reformed by either an additur or remittitur. Under the new standard of review, the appellate court should review the jury's award for abuse of discretion, and the trial court abuses its discretion in granting an additur or remittitur when the jury's award is within the range of its discretion.

Hodapp v. American Indem. Co., 618 So.2d 32, 34 (La.App. 3 Cir.1993).
Additur and remittitur are intended as substitutes for a new trial which may be granted where the verdict is clearly contrary to the weight of the evidence. See Comments under LSA-C.C.P. art. 1811. We thus review the items of damages under the above-established criteria.

PAST LOST WAGES
In its reasons for judgment, the trial court found that "... plaintiff established at trial that he had lost $30,000.00 in past wages as a result of his injuries. Despite that fact, the jury awarded plaintiff only $10,000.00 for lost wages...."
There was, in the record, only the plaintiff's testimony about the job he was scheduled to leave for in Dallas, quoted infra. On review, we agree with the trial judge that the verdict was contrary to the weight of the evidence. Plaintiff's W-2 forms for 1989 and 1990 were remarkably different: in 1990, plaintiff earned over $90,000 more than he had the previous year working for the same employer. Further, his testimony was consistent in that while investigating catastrophe claims, the going rate of income was much higher than indoor work. He stated in trial that another job (which he did not attend due to the trial) paid $1,500.00 per day. His testimony, while unsupported except possibly for the W-2 forms, was not contradicted or impeached.
We agree that a claim for lost wages need not be proved with mathematical certainty, and only requires such proof as reasonably establishes the claim; this proof may consist of the plaintiff's own reasonable testimony. Buras v. United Gas Pipeline Co., 598 So.2d 397 (La.App. 4 Cir.1992); Austin v. Pascarelli, 612 So.2d 201 (La.App. 4 Cir.1992). This testimony must be accepted as truthful, absent contradiction or impeachment. See Partner v. Anderson, 513 So.2d 471 (La.App. 2 Cir.1987). After considering the record herein in connection with the jurisprudence, we find that it was not reasonable for the jury to conclude that plaintiff had lost only $10,000.00 in past wages, and the weight of the evidence proves a much greater loss. The trial judge therefore did not abuse his discretion in increasing the award to $30,000.00.

FUTURE LOST WAGES
Plaintiff did not establish that he will suffer a future loss of wages due to the injuries suffered. Mr. Fleming's income, as seen previously, increased five fold from that of the previous year. Dr. Aiken testified that more often than not, persons with plaintiff's injury will have progressive arthritis, and, in his opinion, there was a greater than 50% claim that a knee replacement would be necessary in 20-30 years. Such surgery would restrict plaintiff to more sedentary work. However, there was no testimony or evidence to prove how this would impact on plaintiff's income 30 years into the future.
A claim for loss of earnings need not be proven with mathematical certainty, but only by such proof as reasonably establishes plaintiff's claim. Veazey v. State Farm Mutual Automobile Insurance Co., 587 So.2d 5 (La.App. 3rd Cir.1991). In Guidry v. Sam Grimmett, Inc., 557 So.2d 249, 253 (La.App. 3rd Cir.1989), writ denied, 558 So.2d 557 (La.1990), this court reasoned as follows:
Damages for loss of future earnings are speculative. Factors which should be considered in assessing such an award include age, life expectancy, work life expectancy, investment income factor, productivity increase, prospects for rehabilitation, probable future earning capacity, loss of future earning capacity, loss of earning ability, and inflation. Lanclos v. Rockwell International Corporation, 470 So.2d 924 (La.App. 3rd *473 Cir.1985); writ denied, 477 So.2d 87 (La. 1985). (Emphasis ours)
Furthermore, in Folse v. Fakouri, 371 So.2d 1120, 1124 (La.1979), the Supreme Court stated as follows:
Earning capacity in itself is not necessarily determined by actual loss; damages may be assessed for the deprivation of what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. The theory is that the injury done him has deprived him of a capacity he would have been entitled to enjoy even though he never profited from it monetarily.
In awarding damages for impairment of earnings capacity, the trial court is accorded broad discretion. Perez v. State Through Department of Transportation and Development, 578 So.2d 1199 (La.App. 4th Cir.1991), writ denied, 581 So.2d 706 (La.1991).

Jenkins v. Kerr-McGee Corp., 613 So.2d 1097, 1105 (La.App. 3 Cir.1993).
See also, Young v. Armadores de Cabotaje, S.A., 617 So.2d 517 (La.App. 4 Cir.1993); Mistich v. Pipelines, Inc., 609 So.2d 921 (La.App. 4 Cir.1992).
In Smith v. Louisiana Farm Bureau Cas. Ins., 603 So.2d 199, 204 (La.App. 3 Cir.1992), the court denied an increase in future loss of wages thus:
Loss of wages resulting from an offense or quasi-offense must be proven with reasonable certainty. Damages which are purely conjectural or uncertain are not allowed. Meyers v. Imperial Cas. Indem. Co., 451 So.2d 649 (La.App. 3rd Cir.1984).
Assuming for the moment the correctness of Smith's contention that she will suffer a loss of $4,000 yearly because of her inability to work at the same pay level she received prior to the raccoon bite, we find that Smith failed to carry her burden of proof. The record is void of any evidence of Smith's work life expectancy. No economist testified, and Smith's attempt to introduce a table of the United States Vital Statistics, without any testimonial foundation, was properly rejected by the trial judge. In the absence of such record evidence, we are unable to examine Smith's contention. Therefore we find that the jury's award of $38,000 for Smith's past and future loss of wages was not manifestly erroneous.
A similar analysis is called for in the present case. This record is likewise devoid of evidence of work life expectancy, economist testimony, etc. We find no abuse of discretion, either by the jury or the trial judge, in refusing to award this item of damages. Plaintiff did not carry his burden of proving that he will suffer future economic loss of future wages.

GENERAL DAMAGES
Plaintiff complains that the award of general damages for his injuries is inadequate, and urges us to raise it, citing several cases with higher awards.
In assessing general damages in cases of tort, much discretion is given the trier of fact. Perniciaro v. Brinch, 384 So.2d 392 (La.1980). Before we will disturb such an award, the record must clearly reveal that the trier of fact abused its discretion in making the award based upon the particular injuries and their effect upon the injured victim(s). Perniciaro, supra and Reck v. Stevens, 373 So.2d 498 (La.1979). Scott v. Hosp. Serv. Dist. No. 1, 496 So.2d 270 (La.1986). In this regard, the award will be modified only to the extent of raising it (or lowering it) to the lowest (or highest) amount which is reasonably within the discretion of the jury.

Pritchett v. Martin, 612 So.2d 290, 292 (La.App. 5 Cir.1992).
Reck v. Stevens, 373 So.2d 498, 501 (La. 1979) cautioned the courts of appeal to take into consideration the particular effects of the particular injuries upon the particular plaintiff:
Thus, the initial inquiry must always be directed at whether the trier court's award for the particular injuries and their effects upon this particular injured person is, a clear abuse of the trier of fact's "Much (FN3) discretion," La.Civ.C. art. 1934(3) in the award of damages. It is only after articulated analysis of the facts discloses *474 an abuse of discretion, that the award may on appellate review, for articulated reason, be considered either excessive, Carollo v. Wilson, 353 So.2d 249 (La.1977); Schexnayder v. Carpenter, 346 So.2d 196 (La. 1977), or insufficient, Olds v. Ashley, 250 La. 935, 200 So.2d 1 (1967). Only after such determination of abuse has been reached, is a resort to prior awards appropriate under Coco for purposes of then determining what would be an appropriate award for the present case.
In the case before us, plaintiff is a 31 year old man who, after undergoing arthroscopy, has returned to most of his regular activities, with some limitations. According to the record, the only limitations he now has is that some leisure activities are curtailedhe stopped playing racquetball (which previously he had played only five or six times a year); he still lifts weights, although he does so less often; he continues to play golf (his handicap appears to have changed very little). There is no other evidence of a diminution of his present lifestyle. Mr. Fleming has undergone one arthroscopy, and demonstrated no inclination or indication that he was willing to have another one in the near future.
We do not find that the testimony of Dr. Aiken established with requisite probability that knee replacement surgery so many years into the future will be required. In the rather distant future, the prospect of surgery becomes speculative and the nature of the underlying problem, arthritis, makes it difficult to relate such procedure to the accident in question.
A review of the facts and circumstances, the effect of the particular injuries on this particular plaintiff, reveals no abuse of discretion in the additur granted by the trial court. As we review the reasonableness of the underlying jury verdict, we find that the original award was too low, and that the trial court correctly found the verdict inadequate so as to require additur.

FUTURE MEDICAL EXPENSES
An award for future medical expenses by nature is not susceptible of mathematical certainty. Like any other element of special damages, however, future medical cost or expenses must be established with some degree of certainty, and a plaintiff must demonstrate that such expenditures more probably than not will be incurred. Thomas v. Petrolane Gas Service, Ltd., 588 So.2d 711 (La.App. 2d Cir.1991), writ denied, 590 So.2d 1201 (La.1992) (citation omitted); Durkee, infra. The burden of proof in a claim for future medical expenses is a preponderance of evidence. Durkee v. City of Shreveport, 587 So.2d 722, 730 (La.App. 2d Cir.1991), writ denied, 590 So.2d 68 (La.1991). Awards will not be made for future medical expenses which may or may not occur, in the absence of medical testimony that the expenses are indicated and setting out their probable cost. Durkee and Hunt [v. Bd. of Supervisors, 522 So.2d 1144 (La.App. 2d Cir.1988)], both supra (citations omitted).

Coffin v. Bd. of Sup'rs of La. Univ., 620 So.2d 1354, 1364 (La.App. 2 Cir.1993).
Also see Mistich v. Pipelines Inc., 609 So.2d 921 (La.App. 4 Cir.1992).
As pointed out above, the medical evidence does not establish the degree of probability necessary to support an award for future medical expenses. While another arthroscopy was recommended, plaintiff has continued to decline it; we have discussed the knee replacement surgery in the foregoing section and it need not be reiterated here. Under these circumstances, we find that an award for future medical expenses was properly denied.

FAULT PERCENTAGE
We find no manifest error in the determination by the jury that Smith was 90% at fault, and Ormond 10% at fault in the accident. There were two experts who testified at trialone who found the club design to be dangerous, and one who did not. We said in Bourgeois v. Roudolfich, 580 So.2d 699, 702 (La.App. 5 Cir.1991) as follows:
A trier of fact, be it judge or jury, must weigh expert testimony as it weighs any other evidence and is not bound by it. Comberrel v. Basford, 550 So.2d 1356 (La. App. 5th Cir.1989), writs denied 556 So.2d *475 1284 & 1286 (La.1990). Where findings are supported by credible evidence which furnishes a factual basis for them, we will not disturb them absent manifest error. Canter v. Koehring Company, 283 So.2d 716 (La.1973).
See also Coley v. State Through DOTD, 621 So.2d 41 (La.App. 2 Cir.1993) which held at p. 50:
However, even more basic than the above proposition is the proposition that a trial court, after weighing and evaluating the medical and lay testimony, may accept or reject the opinion expressed by any medical expert. The trial judge should evaluate the expert testimony according to the same rules as apply to other witnesses. The trial court is not bound by expert testimony. It may substitute its own common sense and judgment for that of an expert witness where, in the opinion of the trier of fact, such substitution appears to be warranted by the evidence as a whole. The trial court's evaluation of expert and lay testimony will not be disturbed unless found to be clearly wrong. Lloyd v. TG & Y Stores Co., 556 So.2d 629 (La.App. 2d Cir.1990).
The jury was not bound to accept the determination of either one or the other expert. After reviewing the testimony and evidence delineated hereinabove, while we may have felt that Ormond was not at fault at all, we can find no abuse of discretion in the factfinder's evaluation of the expert testimony, nor in the allocation of damages made by the jury. While there may have been some amount of design defect which afforded no three dimensional separation of the golf cart area from the sidewalk, we agree that the great majority of fault must remain with Smith, who attempted to operate the cart from the passenger side and who had the responsibility to watch out for pedestrians. Therefore, we find no manifest error in this determination of comparative fault.

COSTS
Plaintiff has stipulated that costs for the deposition in question should not be taxed, inasmuch as it was not used. Such costs are therefore deleted from the judgment.

DECREE
For the above reasons, the judgment is affirmed.
Costs of Mr. Smith's deposition in the amount of $96.00 is deleted from the judgment. Costs of this appeal are taxed in the following proportions: defendant/appellant is assessed 90% of the costs with plaintiff liable for the remainder.
AFFIRMED.
NOTES
[1] Due to clerical error, proof of the acceptance of additur was omitted from the trial record, and this Court dismissed the original appeal taken in March of 1992. The defendants were permitted to supplement the record with the appropriate judgment, and another appeal was granted. Thus, the case is now properly before us.