646 So.2d 1229 (1994)
Ancel ABADIE and Keith Surtain
v.
CITY OF WESTWEGO.
No. 94-CA-536.
Court of Appeal of Louisiana, Fifth Circuit.
November 29, 1994.
Rehearing Denied January 17, 1995.
*1230 Robert J. Bruno, Natasha R. Zimmerman, New Orleans, for plaintiffs/appellants.
John J. Molaison, Jr., W.J. LeBlanc, Gretna, for defendant/appellee.
Before DUFRESNE, WICKER and CANNELLA, JJ.
WICKER, Judge.
This appeal arises from a suit filed on behalf of plaintiffs/appellants, Ancel Abadie and Keith Surtain, against defendant/appellee, the City of Westwego, for injuries sustained when a Westwego employee, Rickey Lapine, struck these two pedestrians while he was driving a Westwego truck. Westwego pled the affirmative defense of sudden unconsciousness. The trial judge concluded Westwego had borne its burden of proving the defense and dismissed plaintiffs' claims. Abadie and Surtain now appeal. We reverse.
Lapine testified that on November 22, 1991 while driving a Westwego truck he had a coughing fit and passed out. He had been ill since October 31, 1991 with a cough which got progressively worse. His physician, Dr. John Finn, prescribed medication. However, for two days prior to the accident Lapine had not taken any medicine. Lapine stated he had never passed out from coughing before this instance.
Linda Berthelot Lee witnessed the accident. She was driving directly behind Lapine. He was going slowly at 20 miles per hour and suddenly fell sideways. Afterwards, his truck veered to the right. He hit a parked car and two pedestrians; namely, Abadie and Surtain. Abadie and Surtain testified they were cutting off a water valve at an apartment building when Lapine's truck struck them unexpectedly. Both Abadie and Surtain were taken by paramedics to Meadowcrest Hospital shortly after the accident.
On appeal the appellants argue the trial judge erred in excusing the appellee's negligence under the sudden unconsciousness defense, and in failing to award damages.
The trial judge correctly noted the Louisiana Supreme Court opinion in Brannon v. Shelter Mut. Ins. Co., 507 So.2d 194 (La.1987) set forth the proper standard for proving this affirmative defense. The burden of proof is by clear and convincing evidence. Id. However, the Brannon court concluded that burden had not been met in a case factually similar to the one at bar. In Comments, The Decline of The Sudden Loss of Consciousness Defense in Louisiana: The Erosion of the Requirement of Proving Fault in Unavoidable Accident Cases, 35 LOY. L.REV. 1377, 1400-1401 that case was analyzed as follows:
The Brannon court purported to eliminate a perceived unfairness to plaintiffs, which resulted from the defendants' attempt to escape liability based upon the unforeseeability of the driver's loss of consciousness. To compensate for this perceived unfairness, the Louisiana Supreme Court required the defendants to establish the sudden loss of consciousness defense by clear and convincing evidence. However, as argued in the dissenting opinion, there existed sufficient evidence in Brannon for a reasonable trier of fact to conclude by clear and convincing evidence that the driver suffered a sudden blackout. Therefore, in reality, the Louisiana Supreme Court intended to virtually eliminate the defense to afford injured plaintiffs compensation without committing to a non-negligent fault standard. Ironically, however, plaintiffs will still be denied recovery in those rare cases in which clear and *1231 convincing evidence is fortuitously present [footnote omitted].
In Brannon one witness/passenger saw the driver slump over the wheel and fail to respond shortly before that driver veered off the road. The witness could not tell whether the driver was unconscious. The autopsy report on the driver was inconclusive as to whether the driver suffered a sudden loss of consciousness although there was evidence she had up to 50% narrowing of the arteries.
In the instant case Lee testified she had no idea why Lapine slumped over. Dr. John Finn, a family practitioner, testified he was treating Lapine for a condition which was allergic in nature. He began treating him for this condition on November 9, 1991. He saw Lapine again on November 18, 1991. He next saw Lapine after the accident on the same date.
Dr. Finn stated there was no way to verify Lapine's statement he passed out coughing. Based on the physical evidence he does not know that Lapine passed out coughing. He explained that assuming Lapine passed out then the most likely explanation for his symptoms would be the "Valsalva Maneuver." However, he has only seen the "Valsalva Maneuver" occur in elderly patients when straining at the toilet. Although he is aware of this condition happening when a person coughs, he has never seen it associated with a cough in his 27 years of practice.
The record does not support a finding that Westwego met its burden of proving the defense of sudden unconsciousness by clear and convincing evidence. Lapine was negligent in veering off the road and striking two pedestrians. There is no showing of negligence on the part of the pedestrians.
Having found manifest error we next turn to an independent review of the record to determine whether Abadie and Surtain met their burden of proving by a preponderance of the evidence the causal connection between the accident and their injuries. Gonzales v. Xerox, 320 So.2d 163 (La.1975); Coleman v. Victor, 326 So.2d 344 (La.1976).

SURTAIN:
Surtain testified he received head, neck, and back injuries from the accident. The only medical expert to testify on behalf of Surtain was Dr. Kenneth Vogel, a neurologic surgeon. Dr. Vogel's deposition was introduced into evidence. He testified he first saw Surtain April 30, 1992 after being referred by Dr. Manale. Dr. Manale did not testify on behalf of Surtain.
Dr. Vogel testified Surtain denied previous injuries. However, Surtain testified at trial he was in a car accident the same year he saw Dr. Vogel. He thought the accident occurred at Mardi Gras in 1992. He stated that in the 1992 accident he went through the windshield and suffered neck and back injuries. These are the same injuries Dr. Vogel treated him for later in 1992. Dr. Vogel had no knowledge of these injuries when he diagnosed Surtain in April, 1992 as having lumbar strain, cervical strain, and possible facet disease. He also never testified that the 1991 accident caused the problems he diagnosed and treated.
Various medical bills totaling $22,184.56 were introduced. However, the record is devoid of any evidence or stipulation these bills were for treatment of injuries caused by the current accident. Nevertheless, it is undisputed that Surtain was taken to Meadowcrest Hospital shortly after the accident. That bill totaled $1,016.40. The Meadowcrest bill, dated the date of the accident, is unclear and unreadable in parts regarding any diagnosis made that date. Furthermore, laboratory reports from Meadowcrest dated the date of the 1991 accident indicate the following: (1) normal knee cap; (2) normal lumbar spine, and (3) normal skull series.
Surtain did not meet his burden of proving the 1991 accident caused the cervical strain, lumbar strain, lumbar instability, and lumbar facet arthropathy which were treated by Dr. Vogel in 1992.
Surtain testified his neck and back were hurting after the accident. At the hospital he complained of injuries to his knee, head, neck, and back. All three witnesses to the accident testified he was hit by the truck. Surtain stated the truck hit his knee and that he suffered head, neck, and back injuries.
Although he received normal medical reports from Meadowcrest we conclude he suffered *1232 minimal damages from the 1991 accident. We also find Surtain did not meet his burden of proving loss of wages caused by the current accident. Although he testified he has not worked since the 1991 accident there was no evidence his lack of employment was caused by injuries sustained in that accident.
After examination of the record we conclude an award which is fair and just and supported by the record is $1,016.40 in special damages and $1,000.00 in general damages. Whitaker v. Mullinax, 628 So.2d 222 (La.App.2nd Cir.1993), writ denied, 635 So.2d 241 (La.1994); Whaley v. Commercial Union Ins. Co., 499 So.2d 555 (La.App.2nd Cir. 1986).

ABADIE:
Abadie, who at the time of trial was in his mid 30's, testified he was struck on the front of both knees and knocked against a cyclone fence. He bounced back onto the truck and his right side hit the body of the truck. He was taken to Meadowcrest shortly after the accident.
He stated his right knee was fractured and his leg was placed in a cast. He also stated he had a small fracture in his elbow and that his neck, shoulder blade and lower back hurt.
Two orthopedic surgeons testified. Dr. Robert Steiner, the defense's independent medical examiner, testified at trial, March 29, 1994. Dr. Bernard L. Manale, Abadie's treating physician, testified by deposition taken August 24, 1993. These two experts gave conflicting testimony regarding Abadie's alleged injuries to the cervical spine, lumbar spine, and knees.
Dr. Manale testified he first saw Abadie on December 11, 1991, less than a month after the accident. On that date he examined him, took x-rays, and a history. The only prior history of a injury given by Abadie was of a fracture to the left thigh at the age of 13. Surtain told Dr. Manale he wore a cast then but fully recovered.
Abadie testified that while he was in prison, prior to this accident, he tore ligaments and cartilage in his left knee. While in prison, in August, 1990, he stated he was diagnosed with "chronic discomfort" in his left knee. Only Dr. Steiner, not Dr. Manale was aware of the injury to the left knee.
Dr. Manale testified Abadie's chief complaint on his first visit was knee pain. His other complaints were pain in his neck, low back, shoulder, right thigh, and right elbow. Abadie also told him his left knee snapped.
Dr. Manale testified Abadie told him persons at Meadowcrest had informed him he had two fractures in the right knee. However, Dr. Manale's review of the x-rays revealed no fractures. At trial Abadie testified his right knee was placed in a cast at Meadowcrest. Dr. Manale stated Abadie told him his leg had been placed in a splint.
Dr. Manale diagnosed Abadie as having soft tissue injury as the result of the accident. His findings as well as those of Dr. Steiner are described below.

LUMBAR SPINE:
Dr. Manale testified Abadie's range of motion was restricted in the lumbar spine when he examined him on the first visit. On the first visit Dr. Manale found reflexes in both the upper and lower extremities to be normal. X-rays of the lumbar spine revealed a bone spur and a defect called spondylolysis. These two problems, however, were not caused by the accident. He diagnosed Abadie on that first visit as having a lumbar sprain with a pre-existing lumbar spondylolysis.
Dr. Manale next saw Abadie on January 22, 1992. At that time Abadie still complained of back pain and stiffness. Dr. Manale did not report any further complaints of back pain by Abadie until Abadie's visit of September 11, 1992. Abadie had seen Dr. Manale several times in the interim. This September visit followed his knee surgery described below on February 28, 1992.
At the September visit Abadie denied falling or hurting himself since the 1991 accident. Dr. Manale ordered an MRI. From his review of the test he could not conclude if any of the anatomic abnormalities on the MRI were related to the accident. The MRI showed degenerative disc disease. Dr. Manale felt Abadie had a chronic process in his back which had been there a long time.
*1233 Nevertheless, he felt the lumbar sprain was caused by the accident.
Dr. Manale testified that from September 11, 1992 to February 15, 1993 Abadie complained his back pain worsened. On February 15, 1993 Dr. Manale noted spasms in the back where he had not previously noted. When asked why Abadie's back was getting worse he explained that with an anatomically normal spine the rate of recovery from a sprain is rapid, either weeks or months. However, with an abnormal spine the rate of recovery is unpredictable.
In March, 1993 Dr. Manale told Abadie of a surgical option for his back after Abadie had had a positive diskogram. Abadie declined surgery, deciding to work within his physical capabilities. Dr. Manale agreed. Dr. Manale explained that he had not recommended surgery.
Dr. Manale stated that by March, 1993 Abadie was complaining of good and bad days with his back. On July 21, 1993 Abadie's back pain had worsened to the extent that he now had limited motion by 50% as well as a lot of spasm. In July, 1993 Abadie had been lifting a 200-pound object at work. Dr. Manale warned him that repetitive lifting of heavy objects would cause his back to give out.
Abadie's last visit to Dr. Manale prior to the taking of the deposition was August 18, 1993. Dr. Manale cleared him for light work and told him not to do heavy lifting. At trial Abadie stated he has now reached the point where he wants back surgery. However, Dr. Manale testified he did not recommend back surgery.
Dr. Steiner examined Abadie November 23, 1993, approximately three months after the last visit testified to by Dr. Manale. He found no acute distress. Although Abadie had subjective complaints of tenderness over certain areas of the spine there was no spasm. Neurological examination of both upper and lower extremities were normal.
Dr. Steiner noted from his examination with x-rays, the history, previous x-rays, and medical records that Abadie had degenerative changes in the spine but no evidence of lumbar nerve root impingement, irritation or deficit. He testified the degenerative changes in the spine pre-existed the accident.
However, in contrast to Dr. Manale, Dr. Steiner saw no objective evidence that his pre-existing degenerative disc condition was worsened by the accident. He explained that whether it worsened or not was based on whether one believed Abadie's subjective complaints.
Spasms in the back were first noted by Dr. Manale on February 15, 1993. There was no evidence of a back injury after the 1991 accident. Dr. Manale also noted "a lot" of back spasms on July 21, 1993. Evidently by the time Dr. Steiner examined Abadie he had improved and no longer had back spasms.
Dr. Steiner based his opinion that the degenerative disc disease was not worsened by the 1991 accident from the lack of objective evidence. That factual conclusion is incorrect since Dr. Manale observed spasms earlier in 1993.
Abadie met his burden of proving he suffered a lumbar sprain caused by the 1991 accident. Dr. Manale's testimony establishes he continued to experience problems with his back until August 18, 1993. The accident occurred November 22, 1991. Thus, for approximately 21 months he experienced problems related to the lumbar sprain. Dr. Steiner observed no problems in November, 1993.

NECK:
On the first visit Dr. Manale noted mild to moderate restriction of the neck. X-rays revealed early degenerative disc disease which was probably not related to the accident. He diagnosed cervical sprain with a pre-existing mild cervical spondylolysis. On January 3, 1993 when he examined him the back of his neck was still tender and he still complained of pain in the back of his head. Dr. Manale reported no further mention of neck problems made by Abadie after January 3, 1993.
Dr. Steiner examined Abadie's neck November 23, 1993, two years after the accident. He found no acute distress. He also noted practically full range of motion. Dr. Steiner found no spasm nor neurological abnormalities. He concluded there were no *1234 objective findings in the cervical spine. Clearly by November 23, 1993, two years after the accident, Abadie had no objective physical findings in the cervical spine.
Dr. Manale, who saw Abadie shortly after the accident, diagnosed a cervical sprain caused by the accident. Since Dr. Manale did not testify to any further complaints or specific treatment of the cervical spine beyond January 3, 1993 this court concludes Abadie met his burden of proving the 1991 accident caused cervical sprain of one-and-one-half months duration.

ELBOW:
Dr. Manale's testimony is uncontroverted that Abadie sustained a soft tissue injury in the 1991 accident which aggravated a pre-existing bursitis. Dr. Manale reported Abadie complained of tenderness in the right elbow on subsequent visits. However, Dr. Manale made no mention of Abadie's complaining of the elbow after January 3, 1992. Abadie did not testify that he continued to suffer pain from his right elbow. Although he stated the elbow was fractured, Dr. Manale disagreed based on the x-rays. Thus, the evidence is uncontroverted Abadie's soft tissue injury in the elbow lasted one-and-one-half months.

RIGHT KNEE:
Dr. Steiner testified that when he examined Abadie he complained of pain in both knees. Dr. Steiner found Abadie had full range of motion of the right knee, a normal x-ray, and no evidence of instability. He concluded he had a normal right knee with no objective findings.
However, Dr. Manale saw Abadie shortly after the accident and diagnosed a right knee sprain. On the date he saw him there was still evidence of a bruise or scrape to the knee. Dr. Steiner only saw Abadie approximately two-years after the accident. By then his knee was normal.
Both Meadowcrest and Dr. Manale performed x-rays to rule out a fracture to this knee. Dr. Manale also performed an MRI. No evidence of fracture was found.
Dr. Manale reported Abadie told him his right knee was better on January 3, 1992 and January 22, 1992. When Abadie complained of cracking in his right knee on March 11, 1992 Dr. Manale thought this was probably due to chondromalacia which pre-existed the accident.
Abadie met his burden of proving he sustained a sprain and a bruise from the accident. The bruise was fading by December 11, 1991. Abadie told Dr. Manale his right knee was better as early as January 3, 1992. Thus, the record establishes a sprained right knee of one-and-one-half months duration.

LEFT KNEE:
Abadie sustained a left knee injury when he was in prison. By his own admission he was diagnosed with a chronic problem in August, 1990. He denied any complaints thereafter until the current accident. He also denied he sought treatment for the knee before this accident.
Both Dr. Manale and Dr. Steiner diagnosed chondromalacia in the left knee. However, Dr. Manale was not aware of the medical records for the prior knee injury.
Dr. Steiner, who examined the prison medical records, was fully aware of the extent of the prior injury. He felt the prison injury was the cause of his problem with his knee. He further felt it was only "possible" and not likely that the trauma of the 1991 accident aggravated the knee condition.
In contrast, Dr. Manale testified that Abadie had an aggravation of a pre-existing condition. His opinion is supported by the fact that Abadie and two other witnesses testified he was struck by the truck. One of his knees was bruised.
Dr. Manale performed arthroscopic knee surgery on February 28, 1992. Following surgery he was placed on crutches. Abadie had no complications from surgery.
Dr. Manale continued to see Abadie for knee complaints through August 18, 1993. At the time of his deposition on August 24, 1993 he had not discharged him from his care. A letter dated March 25, 1994 was introduced as written by Dr. Manale. The letter states Abadie needs another knee surgery. However, there is no evidence this second future knee surgery is a result of injuries sustained in the 1991 accident.
*1235 On August 18, 1993 Dr. Manale cleared Abadie for light work but did not explain whether this was for the back or the knee injury. He combined both injuries in his testimony.
Abadie proved he sustained an aggravation of chondromalacia in the left knee as a result of the 1991 accident. Shortly after the accident he had to have arthroscopic surgery. He continued to have problems with his knee until August 18, 1993 and had not yet been discharged by his treating physician. Dr. Manale did not testify as to the duration of this injury. Dr. Steiner, however, saw Abadie on November 23, 1993 and felt no further surgery was required. He felt that the injury he suffered in prison was the cause of his current problems with his knee.
Abadie proved he sustained an aggravation of a pre-existing knee condition from the date of the accident until November 23, 1993, approximately two years.

MEDICAL BILLS:
Dr. Manale's bill for treatment of Abadie was introduced. However, as noted previously Abadie only proved causation of a lumbar sprain of 21-months duration. Thus, the lumbar spine x-ray noted on Dr. Manale's bill and dated January 3, 1994 of $119.00 is disallowed. Since the treatment for his left knee continued throughout this period the total bill is only reduced by this amount making a total of $3,820.
The only bills to which Abadie has proven were the result of injuries sustained in the accident were:

1. Surgery of Knee
 a. St. Charles General Hospital $ 4,301.05
 b. Radiology 207.00
 c. Orleans Anesthesia 414.00
2. Dr. Manale's Bill 3,820.00
3. MRI of Lumbar Spine 695.00
4. Meadowcrest
 a. Dr. Van Meter 275.00
 b. Hospital Charges 1,043.00
 These figures total $10,755.05.

Regarding these bills the following is noted:
1. Radiology Consultants of G.N.O.
There is no evidence this bill was for injuries sustained in the 1991 accident.
2. St. Charles General Hospital
This bill notes an admission on February 28, 1992, the same date Dr. Manale testified as the surgery date. The bill is not clear. It contains two total charges; namely one for $4,301.05 and another for $5,196.85. Without testimony this court cannot determine the correct charge. We view the discrepancy in the amounts as evidencing a range from $4,301.05 to $7,246.25. Accordingly, we determine that a minimum of $4,301.05 was proven.
3. The Imaging Center
Dr. Manale testified he ordered an MRI on September 11, 1992. This bill is for an MRI on that date. It totals $695.00.
4. Meadowcrest
That bill gives a charge by Dr. Van Meter on the date of the accident of $275.00 and a bill for the hospital of $1,043.30.
5. Oak Park Clinic/Family Health Network
There is no evidence this bill is for charges for injuries sustained in the 1991 accident.
6. Radiology
The radiology bill for the surgery was $207.00.
7. Orleans Anesthesia Associates
This bill was for the surgery and totaled $414.00.
8. Summary Sheet
Abadie has summarized various additional bills as well as the ones noted above. He gives a total of $22,203.25. However, none of the remaining miscellaneous bills were shown at trial to be for injuries which were caused by the accident. There was also no stipulation at trial that these bills were incurred as a result of the accident.

LOST WAGES:
Abadie also claimed lost wages. He testified he did not work between the time of the accident and the time of surgery. However, Dr. Manale testified otherwise. He stated that when Abadie came for his first visit in December, 1991 he did not allow him to go to work but that he did allow him to work in January, 1992. He further stated Abadie *1236 went to work shortly after January 22, 1992. Abadie had surgery February 28, 1992. Dr. Manale did not testify when he released Abadie to return to work. He only stated that when he saw him June 23, 1993 he had gone back to work. On August 18, 1993 Dr. Manale stated he cleared Abadie for light duty work.
John Deris testified as custodian of the records for Acme Truck Lines where Abadie had been employed as a truck driver. The records were introduced for the purpose of showing lost wages. However, we cannot ascertain from the W-2 forms submitted the extent of lost wages due to the 1991 accident.
Abadie himself was unclear. He testified that before the accident he was in the process of leasing a truck and would have earned approximately $6,600.00 a week or a month, he was not certain. Deris had no personal knowledge as to whether Abadie was in the process of leasing a truck. We conclude Abadie did not meet his proving of proving lost wages.
Proof of a claim for lost wages can be based on a plaintiff's own reasonable testimony absent contradiction or impeachment. Fleming v. Smith, 93-CA-488 (La.App. 5th Cir. 5/31/94); 638 So.2d 467. The inconsistencies in Abadie's testimony as well as its conflict with Dr. Manale's testimony do not satisfy the standard of reasonableness.
In summary, the injuries sustained by Abadie were: (1) right knee, neck, and elbow sprains of one-and-one-half month duration, (2) lumbar sprain of 21 months duration, and (3) aggravation of chondromalacia in the left knee requiring surgery and not resolving until two years. For these injuries this court finds he is entitled to $10,755.05 in special damages and $40,000.00 in general damages.
We note we recently upheld a general damage award for $40,000.00 when the plaintiff had one arthroscopic surgery with no significant change in his lifestyle. Fleming, supra. In the instant case Abadie suffered multiple sprains in addition to the knee injury. However, there are many inconsistencies regarding Abadie's alleged injuries and/or disabilities.
Accordingly, for the reasons stated the judgment is reversed. Judgment is now rendered in favor of the plaintiffs, Keith Surtain and Ancel Abadie and against the City of Westwego. Judgment is rendered in favor of Keith Surtain in the amount of $2,016.40 against the City of Westwego. Judgment is rendered in favor of Ancel Abadie in the amount of $50,755.05 against the City of Westwego. Interest from this judgment is payable from date of judicial demand. Costs are taxed against the City of Westwego.
REVERSED AND RENDERED.