758 So.2d 875 (2000)
Robin P. Maltby, Wife of/and Robert M. MALTBY
v.
Thomas LYTTLE and Allstate Insurance Co.
No. 99-CA-1143.
Court of Appeal of Louisiana, Fifth Circuit.
February 29, 2000.
*876 Ernest E. Barrow, II, Gretna, LA, for Plaintiffs-Appellees.
James F. Ryan, Christopher Lawler, Metarie, LA, for Defendants-Appellants.
*877 Panel composed of Judges CHARLES GRISBAUM, Jr., EDWARD A. DUFRESNE, Jr. and THOMAS F. DALEY.
DUFRESNE, Judge.
This case involves damages suffered by Robin Maltby and her husband Robert, plaintiffs, in an automobile collision with Thomas Lyttle. Allstate Insurance Co., Lyttle's insurer, stipulated to the liability of itself and its insured, and the issue of damages was tried before a jury. The plaintiffs urged a motion for JNOV which was granted as to several of items of damages fixed by the jury. Allstate urged a motion styled motion for new trial for reargument only as to the award of future wages, but it was treated in the trial court as a cross-motion for JNOV and also granted. The two verdicts were as follows:

 Jury JNOV
General Damages $32,000 $75,000
Past Medicals 22,500 42,000
Future Medicals -0- 3,000
Past Earnings 5,000 23,365
Lost Earning Capacity 30,000 -0-
Loss of Consortium -0- 5,000

Allstate now appeals those items of the JNOV favorable to plaintiffs, and plaintiffs appeal that item favorable to the insurer. The insurer also asserts that the expert fees fixed by the trial judge were excessive. For the following reasons we set aside the JNOV and re-instate the jury verdict in its entirety, but affirm the amounts of the expert fees.
The procedural device of JNOV is provided in La.Code Civ. Pro., Art. 1811. In Anderson v. New Orleans Public Service, Inc., 583 So.2d 829 (La.1991), the court set forth the law regulating this procedure as follows:
In Scott v. Hospital Service District No. 1, 496 So.2d 270 (La.1986), we set forth the criteria to be used in determining when a JNOV is proper. A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. Scott, supra. In making this determination, the court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.
In reviewing a JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. This is done by using the aforementioned criteria just as the trial judge does in deciding whether to grant the motion or not, i.e. do the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable men could not arrive at a contrary verdict? If the answer to that question is in the affirmative, then the trial judge was correct in granting the motion. If, however, reasonable men in the exercise of impartial judgment might reach a different conclusion, then it was error to grant the motion and the jury verdict should be reinstated.
With the above principles in mind, we turn to the evidence introduced in the present matter. The accident at issue here occurred on June 18, 1994. Plaintiff testified that at that time she had been working three days per week for about 20 years for Marilyn Panger, a chiropractor. Immediately after the collision plaintiff got out of her car and felt fine. Within a few minutes, however, she began to experience back pains which caused her to list over to one side. She went to the emergency room where X-rays were taken and she *878 was sent home with pain medication. She said that she was substantially bed-ridden for about three weeks and could only get around using a cane. She said that this problem was caused by her back muscles tightening up and it had happened to her on prior occasions, but usually the attacks cleared up in two or three days. She also said that she had not had one of these episodes for about a year before the accident. It was also disclosed that she had undergone four spinal fusions over the previous 15 years.
Over the course of the three years following the accident plaintiff underwent two additional surgeries for thoracic outlet syndrome, a constriction of the nerves and blood vessels going to the arms. She missed approximately four months of work because of these procedures. She was also treated conservatively for various low back and cervical back pains by her chiropractor, Marilyn Panger, as well as by two other medical doctors. She claims to suffer from breathing problems which one of her doctors suspects is related to her heavy smoking. She was able to continue working until April of 1997, after which time she began receiving Social Security disability payments. It was also shown that during this three year period she had been to the beach, gone to Europe twice, and went on a cruise with her employer and the office staff, and had ridden a roller-coaster and four-wheel off road vehicle.
Her husband testified that after the accident plaintiff was in a constant state of discomfort and pain. He said that she became withdrawn from him and eventually they separated. He also noted that she has been seeing another person since their separation.
Her medical course was as follows. On the day of the accident, and thereafter on a more or less weekly basis she was seen by Dr. Panger, who routinely did some manipulative procedures on her back. This chiropractor said that early on plaintiff had what appeared to her to be a strain/sprain type of problem in the cervical and lumbar spines, with spasms and headaches at night. She said that before the accident she had treated plaintiff for similar problems, but of a less severe degree. She also said the she suspected that plaintiff suffered from fibromyalgia, which she defined as a malady the can occur in muscle tissue after some trauma, before the accident. She noted that plaintiff had suffered back and neck pains off and on for the entire time that she had worked at the clinic, but that it was worse since the accident. She finally said that she thought the trips to Europe were good for plaintiff because the clinic staff were always with her in case she needed some chiropractic manipulation. She described the beach trip as involving only walking in the surf. The last treatment provided was on August 14, 1996.
Two days after the accident, plaintiff saw Dr. Rudolf V. Hamsa, an orthopedic surgeon. His physical examination was of a 5'0" tall female, 150 pounds, with in mild distress with headaches. The cranial nerves were normal, but there was intense ache in the cervical spine at 50 degrees of motion in all directions. The shoulder was normal. There was acute lumbar pain and listing to the left at the L4-5 and L5-S1 levels with tenderness at the facet joints, but straight leg raising was normal. By June 27, there was a decrease in the low back pain and resolution of the spasms in the upper back. The left shoulder was sore and the neck subjectively stiff, but was otherwise normal. The doctor was aware of the ongoing chiropractic treatments and approved of this course, as well as prescribing anti-inflammatory medication. By July 25, plaintiff was again in distress with recurrent cervical and upper thoracic pain, but with improvement in the lower back.
At this point, this doctor began to suspect thoracic outlet syndrome. On August 15, plaintiff was still in distress in the cervical and upper thoracic back and was given injection of local anesthetic for pain. No mention was made on this visit of any *879 lower back problems. Again, on September 12, there is upper back pain, but no mention of the lower back. On this visit the doctor recommended cervical and thoracic MRIs which were done by an October 14 visit. The thoracic scan was normal, but there was some questionable finding at the C6-7, on vertebra beneath the prior fusion operation. Plaintiff was still complaining of pain beneath the left shoulder blade which the doctor thought might be caused by her heavy smoking or by thoracic outlet syndrome. He therefore referred her to a specialist.
Dr. Warren Gottsegen, a thoracic and vascular surgeon, first saw plaintiff on December 13, 1994. Various tests showed tingling in the hands and decreased blood flow into the arms which this doctor concluded were symptoms of thoracic outlet syndrome more pronounced on the left side. On March 20, 1995, he removed a rib thus releasing the constriction of the nerves and blood vessels. His assessment of this surgery was that it was a complete success. He noted that plaintiff was still complaining of chest and arm pains, but ruled out any relation to the thoracic syndrome. Later in the year plaintiff began complaining of problems on the right side and on November 30, 1995, a similar procedure was done on that side, also with complete success. The doctor said that she has no residual problems or disability because of the thoracic outlet syndrome or the surgeries. He saw her again in January of 1996 when she reported to him for the first time an acute pain in the chest on breathing, talking and coughing. He thought that was her final visit, but may have seen her again on February 2, 1996, although he has no notes for that day.
As to causation, this doctor never stated directly that the problems were related to the accident. He said that plaintiff had come to his office originally with a history of an automobile accident and a history of a cervical fusion. He was asked if things other than automobile accidents can cause the syndrome and said yes. He enumerated trauma, an insidious onset of muscle spasm, blood clotting, a fractured clavicle, stress and, in 30% of cases, for no known reason.
Plaintiff had continued to see Dr. Hamsa after these surgeries. He testified that on visits of May and June, 1995, she reported that she was doing fairly well. Visits in the fall and winter were also unremarkable, but on March 29, 1996, she reported chest pains. The doctor thought this might relate to her smoking and he also learned at this time that she had fractured a rib while over exerting herself during exercise. At a July 10, 1996, visit she reported having a setback in her lower back when she fell backwards in her yard, and apparently also mentioned being stiff from riding an off road motor bike of some sort. Her last visit to this doctor was September 9, 1996. His impression was that plaintiff suffered from fibromyalgia. When asked if she had any other residual problems he said that she had a 2% permanent whole body impairment for "the sprain/strain type thing that she had for her accident situation." He deferred to Dr. Gottsegen as to any residuals from the thoracic outlet syndrome surgeries and, as noted above, this latter doctor said there were none.
On September 25, 1996, plaintiff first saw Dr. Santo LoCoco, an orthopedic surgeon, and has seen him monthly up to the time of trial. He said that on the visit her main complaints were neck and back pains. He noted spasm in the neck and back and subjective limited range of motion, but with a positive Lesegue's test. An X-ray showed a spondylolisthesis, a slippage of one vertebra over another at the joint, at the L3-4 level and thought this was probably the result of the prior disc surgeries. There were no neurological findings. He did not believe her upper back and neck pains were related to the joint slippage, and instead suspected fibromyalgia.
After several months he concluded that she was indeed suffering from fibromyalgia. He described this condition as an *880 autoimmune disorder of unknown cause. He said that trauma, such as an automobile accident could not cause this condition and that he had no information that would lead him to believe that the accident at issue here caused this condition. He did say, however, that trauma can aggravate it. When asked about the specifics of this accident he said he did not learn of it until over three years later, and would therefore defer to her original treating physicians as to any ill effects of the accident.
The defendants had plaintiff examined on February 3, 1998, by Dr. David Aiken, Jr., an orthopedic surgeon. He reviewed her records of the previous back and neck surgeries, and those of her treatments by Drs. Hamsa, Gottsegen, and LoCoco, took an extensive history from plaintiff, and performed a physical examination. He said that she reported pre-accident pains in her neck and back, but that they had become more severe since that time. She reported pains in the neck and shoulders, radiating into the shoulder blades, thoracic back pain, and lumbar pain radiating into her thighs on exertion. He found what he considered a good range of motion in the back and neck for someone who had had four surgeries in these areas. Reflexes and straight-leg raising were normal. Her arms and legs were of equal diameters indicating that there was no muscle atrophy. X-rays taken prior to the accident showed that the two neck fusions had not solidified, and also showed the spondylolisthesis in the lumbar region which Dr. LoCoco had noted. He took numerous X-rays himself and compared these to earlier ones, and he also compared a pre-accident MRI with a post-accident MRI. He said that he could find nothing in these films to indicate any change in the neck or back which might have been caused by the accident. He said that in his opinion the present pains afflicting plaintiff were the result of the prior back surgeries, rather than the accident. He said it sounded reasonable to him that plaintiff may have suffered a strain in the accident, but reiterated that he could find nothing in the records or examination that would show an accident related problem that could still be causing pain. He also said that the term "fibromyalgia" is one that he does not use because there have never been any physical findings to substantiate exactly what the condition is or what causes it. As to whether the accident caused the thoracic outlet syndrome, he too deferred to Dr. Gottsegen.
Plaintiff showed that her total medical bills between the accident and trial came to about $40,000. She also showed that she had lost wages during this same period of some $23,000, and that she is now receiving Social Security disability benefits. The jury implicitly found that the accident was responsible for over one-half of her medical expenses, which is about what the thoracic outlet syndrome surgeries cost. They also must have found that not all of her problems were related to the accident because they only awarded her one-fourth of her claimed lost wages. For general damages they awarded only $32,500, but they also made an award of $30,000 for future wages on scant evidence. Finally, they rejected entirely the husband's claim for loss of consortium.
As stated above, the question for this court is whether, giving the opponent of the JNOV the benefit of all contested inferences and factual findings, the above evidence points so strongly in favor of the moving party that reasonable men could not have reached the decision made by the jury. The testimony of Dr. Aiken was that he could find no relationship between plaintiff's ongoing complaints and the accident, and that in his opinion these problems stemmed from her four previous back and neck surgeries. Dr. Hamsa indicated that plaintiff had a sprain/strain and only a 2% residual impairment. Dr. Gottsegen never made any clear statement as to whether the thoracic outlet syndrome was caused by the accident, although there was a strong inference to that effect. Dr. LoCoco said that the accident did not cause *881 the fibromyalgia that he diagnosed, but may have aggravated it. Marilyn Panger, the chiropractor and employer of plaintiff, said she thought the fibromyalgia pre-dated the accident, although at a less severe level. While plaintiff said she was in increasing pain and had difficulty working between the accident and April of 1997 when she left her job, she also admitted that she was able to travel for leisure during this period. While there was evidence of the two surgeries by Dr. Gottsegen, there was little elaboration as to what was involved in those procedures, and this doctor said that she had a full recovery from these problems. Although plaintiff's husband testified of his wife drifting away from him because of her medical problems, it was also shown that she became involved with another person.
Considering all of the above contested issues and giving the defendants the benefit of all reasonable inferences and factual findings as to the general damages, past medicals, future medicals, past lost wages, and loss of consortium awards, we are unable to say that the evidence points so strongly in plaintiffs' favor that reasonable men could not have reached these results. Giving plaintiffs the benefit of the doubt as to the loss of future wages award, we reach the same conclusion. Having decided that the evidence does not point so strongly in favor of the moving party that reasonable men could not have reached a different result than that of the jury, we hereby reinstate the jury verdict.
Allstate also contests the amount of expert fees fixed in the trial court. The fixing of such fees is left to the discretion of the trial judge, and we will not set aside such fees absent a clear abuse of discretion by him. In the present matter, while we find the fees on the high side, they are not so high as to show such an abuse.
For the foregoing reasons the JNOV entered by the trial judge as to the various items of damages is set aside and the jury verdict is reinstated. In all other respects the judgment is affirmed.
AMENDED AND AFFIRMED AS AMENDED.