985 So.2d 800 (2008)
Peter D'AMBROSIA
v.
Christina LANG a/k/a Cristina Lang and State Farm Mutual Automobile Insurance Company.
No. 07-CA-298.
Court of Appeal of Louisiana, Fifth Circuit.
April 29, 2008.
*803 Deani B. Milano, Metairie, LA, for Plaintiff/Appellee-3rd Appellant.
Peter J. Wanek, Lynda A. Tafaro, Attorneys at Law, Metairie, LA, for Defendant/Appellee-2nd Appellant.
James R. Carter, Attorney at Law, New Orleans, LA, for Defendant/Appellant.
Panel composed of Judges THOMAS F. DALEY, WALTER J. ROTHSCHILD, and FREDERICKA HOMBERG WICKER.
FREDERICKA HOMBERG WICKER, Judge.
The defendants, United Services Automobile Association (USAA), and State Farm Mutual Automobile Insurance Co. (State Farm), as well as the plaintiff Peter D'Ambrosia appeal from a personal injury judgment. In this case, the defendants appeal the jury's damage award, and Peter appeals the jury's damage award, the trial court's limiting the scope of his vocational rehabilitation expert's testimony, and the interest calculation. For the following reasons, we affirm.

PROCEDURAL HISTORY
This appeal arises from a jury verdict concerning an automobile accident. The accident occurred on February 16, 1999 and involved a vehicle driven by Christina Lang and a suburban in which Peter was a passenger. Lang's liability insurer, State Farm, and the suburban driver's uninsured motorist carrier USAA previously paid $45,451.05 to Peter. A jury trial proceeded on all other issues, including quantum, against the defendants in their uninsured motorist capacity.[1]
The jury returned a verdict in favor of Peter awarding past and present medical expenses in the amount of $31,980.16; future medical expenses in the amount of $15,000; general damages (pain and suffering and permanent disability) in the amount of $35,000 and damages for loss of future earning capacity in the amount of $100,000. A judgment in conformity with the verdict was rendered on April 13, 2006. The plaintiff and the defendants filed post-trial motions, which were denied.

UNDERLYING FACTS
Gerald Arceneaux was driving a suburban that contained six passengers, including Peter. Peter's description of the accident and his location in the vehicle was corroborated by the testimony of three witnesses/passengers. Although the trooper who investigated the accident testified that Peter told him he sat in a different location, all three passenger/witnesses denied seeing or speaking to an *804 officer at the scene or the hospital. Peter testified he did not recall. Peter stated that he sat in the "third seat" on the driver's side when the vehicle was struck by the Lang vehicle. He had his arm around his wife and he saw the automobile hit the car on the driver's side. Renee Arceneaux D'Ambrosia, who later married Peter in June 1999, testified that she was in the middle seat of the third seat. She had a large bruise on the back of her shoulder where Peter punched her during the accident. A few minutes after the accident, an ambulance arrived and took them to West Jefferson Hospital's emergency room. Immediately after the accident, Peter complained of sharp pain on the upper back, right shoulder area, extending into his neck. Peter testified that immediately after the impact, he had significant pain in the upper right area, including the shoulder. Peter's right hand is his dominant hand. At West Jefferson hospital, he had a spine x-ray and was released.
The following medical doctors testified at trial or via deposition regarding Peter's injuries: Dr. Robert D'Ambrosia, Peter's father; Dr. Eric Ward Carson; Dr. David Drez; Dr. Austin Sumner; Dr. John Cazale; Dr. William Albert Martin; and, Dr. Eric McCarty. Dr. McCarty performed arthroscopic surgery on Peter's shoulder in April 2005. There was no evidence that Peter had a prior shoulder injury.
On the day of the accident, Dr. Robert D'Ambrosia, a board certified orthopedic surgeon, examined Peter at the Arceneaux house. He prescribed samples of anti-inflammatory medication. Dr. Robert D'Ambrosia testified that Peter's shoulder was swollen, tender, lax, and very painful. Peter had difficulty moving it. Peter did not have full strength in his shoulder. Peter gave him a history of dislocating it and the examination was consistent with that history. He recommended that Peter see Dr. Carson.
Dr. Carson, the orthopedic specialist who Peter saw two days after the accident, treated him conservatively for a subluxation, which is a partial dislocation of the right shoulder. He suspected a labral tear that might require diagnostic arthroscopy and repair. In 2005, Dr. McCarty performed an arthroscopic procedure to repair, among other things, injury to the labrum. Dr. Carson did not see Peter from April 28, 1999 until May 10, 2000. In the interim, between nine months to a year after the accident, Dr. Peter D'Ambrosia noticed Peter had a winged scapula. Peter was in the family room at the time with his shirt off. As a result, Dr. Robert D'Ambrosia took Peter to see Dr. Drez. In February 2000, Dr. Drez confirmed that Peter had a winged scapula. About one month later, Dr. Sumner, a neurologist, saw Peter and after that performed EMG studies to assess whether there was nerve damage. Dr. Carson explained that he had not diagnosed the winging because he did not have Peter push against a wall; this is not a routine part of the examination. Dr. Sumner did not know when the winging appeared. But he opined that scapula winging often escapes detection by examining doctors for long periods of time before being recognized.
There was conflicting testimony regarding the nerve injury. When Dr. Robert D'Ambrosia examined Peter the night of the accident, he did not suspect a nerve injury. Dr. Sumner's first EMG study revealed damage to the accessory nerve. On the second EMG study that was performed almost two years after the accident, he recorded an additional problem with the long thoracic nerve.
According to Dr. Sumner, Peter injured two major nerves in the vicinity of the shoulder. Dr. Sumner believed that his *805 first EMG was unsuccessful because he failed to properly place the needle in the serratus anterior muscle. Dr. Sumner testified that as of the last exam of March 2001, it was his opinion that Peter sustained permanent nerve damage. And with a reasonable degree of medical certainty based on his exam, history, and any medical records he reviewed, that those nerve injuries resulted from the accident.
Dr. John Cazale, an orthopedic surgeon, testified that on July 10, 2001, he did an independent medical exam on State Farm's behalf. Peter had obvious winging of the right scapula. Dr. Cazale thought that Peter's symptoms were more than likely secondary to the accident because Peter was asymptomatic before the accident and then he became symptomatic. He thought more likely than not Peter possibly had winging in 1999 or 2000 when Dr. Carson saw him but Peter was not tested for it. Normally, Dr. Cazale would not have tested for winging.
Dr. William Albert Martin, a board certified neurologist, testified he did an independent medical exam of Peter on March 19, 2003. Peter had some winging of the scapula. By the time he saw Peter, Peter seemed to be in a convalescent phase and the injury to the "spinal accessory," which controls the trapezius muscle appeared to have almost cleared completely. Still, his winging was permanent. Although there was some winging of the scapula, he had no apparent impairment of motion around the shoulder as a result of the weakness. If the last EMG was accurate, then the injury to the thoracic nerve occurred between the first and second test. Dr. Martin did not feel the long thoracic nerve problem was caused by the accident. Trauma can cause long thoracic nerve injury. Other causes are stretching, lifting weights or athletic activities.
In 2005, Dr. Eric McCarty observed that Peter had a winged scapula and some laxity in the shoulder joint itself. The arthroscopic surgery did not address the neurological winging problem. Peter still had the winging. After surgery, Peter did not have a normal shoulder. Dr. McCarty testified there was some permanent impairment of the scapula and the scapular winging was permanent. Based on the Fifth Edition of the American Medical Association's Guide to physical impairment, he would give Peter an anatomical impairment of 15% of upper extremity permanent impairment and 9% whole body impairment. Dr. McCarty stated that it was more likely than not that Peter's injuries resulted from the trauma of the February 1999 accident.
Dr. Robert D'Ambrosia testified that to a reasonable medical degree of certainty, the shoulder injury that required arthroscopic surgery was caused by the accident.
At the time of the accident, Peter was 23 years old. He was preparing for the MCAT to get into medical school. He had graduated with honors from Bellehaven College in Mississippi. About four months after the accident, he began teaching seventh and eight grade science at Immaculate Conception. He taught there for one year. Then he started medical school. He was in medical school for four years. He graduated from LSU Medical School in May 2004 and was accepted at the University of Colorado. He moved to Colorado a month later. He started his internship at the University of Colorado Orthopedics five-year program around July 2004.
Renee also graduated from LSU Medical School in 2004. They graduated in the top five to eight percent of the class. They were in an honor society that was based on good grades and character. They both moved to Colorado to do their *806 residency. Renee testified she has known Peter since they were 15 years of age. Orthopedics was something he wanted his entire life. Dr. Robert D'Ambrosia testified that Peter had always wanted to be an orthopedic surgeon.
At the time of trial, Peter was a medical doctor and a second year orthopedic resident in Denver Colorado. Orthopedic residency is a five-year program after medical school. A fellowship could take an additional one-to-two years beyond residency.

DISCUSSION

VOCATIONAL REHABILITATION EXPERT
Peter's counsel called Thomas Meunier as an expert in vocational rehabilitation to testify regarding loss of future earning capacity. Mr. Meunier was not allowed to testify to the average wages of orthopedic surgeons. The trial judge reasoned that without an economist to testify regarding the final calculation of present value, the testimony lacked the proper foundation. Mr. Meunier did testify, however, as a vocational rehabilitation specialist that based on the medical evidence, Peter has a non-severe work disability that would result in either a shortened work life or a reduction in earned wages. The jury awarded $100,000 for loss of future earning capacity.
Peter argues that the trial judge erred in failing to allow Mr. Meunier to testify regarding the national average wages of orthopedic surgeons.[2] In a related assignment, Peter argues the jury verdict was tainted because of the omitted testimony. As a result, he contends the jury had only the following evidence to consider: Peter's income tax returns as a resident, and Mr. Meunier's testimony of shortened work life and reduced earning capacity. He asserts that if the jury received the figures of the average orthopedic physicians' income, it would have given a higher award. Peter also argues in a related assignment that the trial judge erred in failing to grant his motion for a new trial because of the legal error. For the reasons that follow, we find no merit to these assigned errors.
Mr. Meunier testified that he has been a licensed rehabilitation counselor for almost 30 years. He completed graduate course work in psychology but he did not complete his Master's Degree in psychology. He works with people who have disabilities. He takes information from a doctor or an allied health professional concerning the person's functioning or restriction of functioning. In order to develop a vocational rehabilitation plan, he considers age, education, work history, aptitude, and abilities. He has previously qualified as an expert in court to testify to lost wage earning capacity. Mr. Meunier admitted that he is not an economist and he does not have a degree in business, accounting, finance, or economics. Instead he works in conjunction with economists.
In this regard, he identifies the types of work that people could do after an injury and then provides the economist with their earning capacity. The economist then takes that figure and discounts it to work up an analysis.
*807 Mr. Meunier testified that his purpose in this case was to outline what the loss of wage earning capacity would be if Peter were unable to either continue as an orthopedic surgeon or to have a reduced work life as an orthopedic surgeon. He stated that he understood that Peter was not presently an orthopedic surgeon nor has he ever worked as one.
Defense counsels objected to the testimony regarding wage loss calculations that are typically done by economists, who would discount the figures. Additionally, they argued that the evidence did not support such a speculative award.
The trial judge sustained the objection. Then, outside the presence of the jury, Peter's counsel made a proffer of proof by examining the witness. Defense counsels did not cross-examine Mr. Meunier on the proffer.
Later, during a bench conference that was held outside of the presence of the jury, the trial judge reconsidered his ruling. He concluded after reading excerpts from depositions there was sufficient testimony to allow into evidence lost earning capacity testimony as long as it was competent evidence.
The trial judge said he would have to hear a foundation and determine the methodology in order to allow Mr. Meunier to testify regarding numbers. He was not willing to accept the witness as an expert economist because Mr. Meunier did not have the expertise to do the discount rate. On the other hand, if the methodology was within his field of expertise and he simply applied numbers to the tables, he might be willing at that point to let the numbers and the tables into evidence.[3]
Peter's counsel recalled Mr. Meunier. He was accepted, without objection, as an expert in vocational rehabilitation. His experience included providing information regarding future impairment even though that person had not yet entered a particular occupation. A vocational rehabilitation counselor considers age, academic achievement, and skill level involved in the training, ultimate career goal, and physical ability to do that type of job. With someone without an established earning capacity, a vocational counselor typically considers tables used by governmental entities as well as by his profession. Typically, he uses tables that outline earnings and average earnings for different occupations.
He also looks at the physical demands of an occupationin this case an orthopedic surgeon. The United States Department of Labor publishes The Dictionary of Occupational Titles that describes the physical, intellectual, and aptitude demands of a career. The Department of Labor also publishes an Occupational Outlook Handbook which describes the demand for certain occupations, the working conditions, and earnings by region.
Mr. Meunier uses work-life expectancy tables for people with severe disabilities, and non-severe disabilities compared to people of the same age and level of education. Through this means, he determines a difference in work life. This can be done for a child, a teenager, or someone who is still in school and who has not actually earned money. It is accepted in his profession to be able to project those types of earnings based on intelligence, physical ability, demand for the occupations, and similar factors. He reviews information from the treating physicians, such as functional impairments.
*808 Peter testified he believed he spoke to Mr. Meunier on three occasionstwice by telephone and once in person. He saw Mr. Meunier the week before trial.
Mr. Meunier testified that in Peter's case, testing was unnecessary. Peter, who was 30 at the time, was in the second year of residency in an orthopedic surgery program. As such, Mr. Meunier had no reason to believe Peter was functioning below where he should be intellectually, verbally, or otherwise. He was in the top of his class in medical school. He planned on staying in the profession and did not have any plans to leave residency. He still planned on making this his career.
He reviewed medical records and depositions regarding Peter. He spoke to Peter and obtained more detailed information about what, if any, problems he was having or that he was anticipating having once he became an orthopedic surgeon.
He assumed that Peter will be able to get through his residency. According to some medical testimony, if true, Peter will have some problems with the essential duties of being a surgeon, such as reaching and using his arm 90 degrees and above or reaching out in all planes. These actions are essential duties of an orthopedic surgeon. This establishes a work disability, which is something that will interfere with the essential duties of his job.
Mr. Meunier assumed Peter does not have a severe disability, which would prevent Peter from doing any and all types of activities as a doctor. "It may not even prevent him from, if you assume even he's going to have problems in the future, getting out of his residency and becoming an orthopedic surgeon."
According to the tables, persons with a non-severe work-related disability of the same age, gender, and educational level generally earn less than their non-disabled counterparts and have shorter work-life expectancies. The work-life tables describe the difference between a severely disabled, a non-severely disabled, and a non-disabled person at a certain age, gender, race, and educational level. A vocational counselor looks at the tables and states in all likelihood there is going to be reduced earning capacity based on governmental statistics. There is nothing for certain.
Assuming what the doctors say comes true in the future, then that establishes a work disability and the person will, compared to their non-disabled counterparts, earn less and/or will have a reduced work life.
Using the tables for a non-severe disability, based on age, educational level, gender, and race, which applies to Peter, there are generally 5.8 fewer years of work life than the non-disabled. Generally, on the average, people who continue to work with some limitation in comparison to those people without limitations, all else being held constant, roughly make 15% less than their non-disabled counterparts. There are two ways to calculate Peter's loss. One is to calculate it in terms of 5.8 years' shortened work-life expectancy. The other is to use a 15% reduction across the board without any reduction in work life.
As a vocational rehabilitation counselor, Mr. Meunier uses tables to determine the national or global salary averages of professions. He used those tables in Peter's case. When Peter's counsel asked him what the tables reflected were the average earnings for salaries for a general orthopedic surgeon, defense counsels objected. The trial judge held a bench conference outside the presence of the jury. Defense counsels argued there was improper foundation in part because the jury charge mentioned present value and Mr. Meunier *809 testified he could not calculate present value. An economist was needed to give the jury a more accurate figure as to loss of earnings capacity. The trial judge sustained the objection.
Mr. Meunier continued his testimony. He stated that if Peter did not have a functional disability, there was no loss of earning capacity as a surgeon. Mr. Meunier did not do any functional testing. He depends on physicians or allied health professionals to provide him with functional information. A functional capacity evaluation is a detailed evaluation of physical abilities related to employment.
When asked whether he knew when Peter was going to enter the workforce, he replied that it could be up to five years or more, depending on whether Peter has a subspecialty or goes into a particular type of training beyond his residency. But no matter when Peter actually begins to work, he is still going to have a shortened work life. Furthermore, the projections to the year 2012 indicate there will be high demand for orthopedic surgeons through that year. He admitted he did not know the specific field in which Peter was going to practice as an orthopedic surgeon.
The following testimony was adduced on the proffer.
Mr. Meunier reviewed physician salaries by specialty and geographic area. He concentrated on the southern region and looked at four different specialties within orthopedic surgeries. These areas are general surgeons, hip and joint orthopedic surgeons, the orthopedic surgeons of the spine, and sports orthopedic surgeons. General surgeons have a mean income of $386,000 a year. Hip and joint surgeons make $467,000 a year. Spine surgeons make $616,000 a year. Sports surgeons make $444,000 per year. Mr. Meunier then averaged the four income brackets to obtain an average of $478,000 a year.
Mr. Meunier testified that initially he had looked at wage loss earning capacity in terms of surgical versus non-surgical specialties but after looking at more medical information from the depositions and talking to Peter, he determined Peter did not want to change his specialty. Thus, Mr. Meunier thought it was more reasonable to look at the average wages of orthopedic surgeons.
The trial judge is vested with broad discretion in ruling on the scope of expert testimony. La.C.E. art. 702; State v. Casey, 99-0023 (La.1/26/00), 775 So.2d 1022, 1038, cert. denied, Casey v. Louisiana, 531 U.S. 840, 121 S.Ct. 104, 148 L.Ed.2d 62 (2000).
Peter argues that the trial judge erred in finding that it was necessary to have an economist testify. He cites for example, Theriot v. Allstate Insurance Co., 625 So.2d 1337 (La.1993), a case from the Louisiana Supreme Court, which permitted an award for loss of vocational opportunity without the testimony of vocational and economic experts. In Theriot, the Louisiana Supreme Court allowed an award based on the testimony of doctors. In that case, however, the nature of the injuries were such that it was evident the child would suffer future loss of vocational opportunities. The evidence showed that the child sustained a very serious visual impairment that he would experience the rest of his life. The physicians' testimony was that as a result of double vision, the child was precluded from pursuing certain occupations. The Court recognized the difficulty inherent in fixing damages for limitation and/or loss of vocational opportunity especially given the youth and inexperience of the plaintiff. But because there was the duty of the jury to compensate the plaintiff for losses occasioned by the fault of another, the jury could not *810 ignore this directive to compensate the plaintiff. Thus the jury abused its discretion in failing to award damages for this loss. 625 So.2d at 1344. In that case there was uncontroverted evidence establishing the loss of vocational opportunities. The court awarded a sum as the lowest amount reasonably within the trial court's discretion in order to compensate the child. Id.
In contrast to Theriot, Peter did not seek to rely solely on the doctors' testimony as did the plaintiff in Theriot. Instead, Peter sought to also establish the loss of future earning capacity by presenting an actual monetary amount. Peter attempted to have Mr. Meunier present the average wages of orthopedic surgeons. But Mr. Meunier testified that he provides this information to an economist who then discounts the amount to present value. He stated he is not an economist. The trial judge was open to the testimony being admitted if Peter provided a proper foundation for the methodology. By his own admission, Mr. Meunier acknowledged he had no expertise in the final calculation. We are mindful that the Supreme Court has on occasion disapproved the use of formulas in arriving at damage awards. McFarland v. Illinois Central Railroad Co., 241 La. 15, 127 So.2d 183, 187 (1961). We believe, however, as does the First Circuit that it is permissible to use a formula to discount to present value, once the loss of earnings has been determined. See: Falcon v. Bigelow-Liptak Corp., 356 So.2d 507, 513 (La.App. 1 Cir.1977).
Thus, for the reasons stated, and under the factual circumstances presented in this case, the trial judge did not err or abuse his discretion in limiting the scope of Mr. Meunier's testimony. Mr. Meunier's proffered testimony regarding the average wages of orthopedic surgeons by his own admission was incomplete without an economist's analysis of the figures. His testimony was wholly unsupported by any knowledge rendering him competent to testify to the actual figures. As such, the jury verdict was not tainted by legal error and the trial judge did not err in denying the motion for new trial on this basis. Accordingly, this assignment lacks merit.
In the related discussion below, we conclude that under these factual circumstances and controlling Louisiana Supreme Court jurisprudence, the failure to call an economist was not fatal to the plaintiff's claim of loss of future earning capacity.

STANDARD OF REVIEW
Under the manifest error standard of review, a factual finding cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong. Jackson v. Tulane Medical Center Hosp. and Clinic, 05-1594 (La.10/17/06), 942 So.2d 509, 512 (citations omitted). In order to reverse a fact finder's determination of fact, an appellate court must review the record in its entirely and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. Salvant v. State, 05-2126 (La.7/6/06), 935 So.2d 646, 650 (citations omitted). The appellate court must not re-weigh the evidence or substitute its own factual findings because it would have decided the case differently. Id. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Id. However, where documents or objective evidence so contradict the witness's testimony, or the testimony is so internally inconsistent or implausible on its face that a reasonable factfinder would not credit the testimony, the court of appeal may find manifest error or clear wrongness even *811 where the finding is purportedly based on a credibility determination. Rosell v. ESCO, 549 So.2d 840, 844-45 (La.1989). But where this situation does not exist, and a factfinder's determination is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Id. at 845.

GENERAL DAMAGES
Peter argues that the trial judge erred in denying his motion for judgment notwithstanding the verdict (JNOV). He contends that the jury was manifestly erroneous in awarding only $35,000 in past and future physical and mental pain and suffering. In this case, the jury awarded Peter all of the past medical expenses incurred as a result of a shoulder injury.[4] Peter contends that the general damage award is abusively low because Peter underwent surgery and has a permanent nerve condition as a result of the injury.
Peter argues alternatively that the trial judge erred in denying his motion for new trial on the issue of general damages. He contends that the new trial should be granted because the verdict or judgment appeared clearly contrary to law and the evidence, citing La.C.C.P. art. 1972(1). Moreover, he asserts that a partial new trial should have been given on the issue of damages pursuant to La.C.C.P. art. 1973 as a discretionary matter. Peter also alternatively argues that the trial judge erred in not entering additur. See: La. C.C.P. art. 1814. In short, Peter contends that the amount awarded does not compensate him for both the orthopedic injury and the nerve injury.
A JNOV "should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover." Maltby v. Lyttle, 99-1143 (La.App. 5 Cir. 2/29/00), 758 So.2d 875, 877 (quoting Anderson v. New Orleans Public Service, Inc., 583 So.2d 829, 832 (La.1991)). "If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied." Id. "In making this determination, the court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party." Id.
The applicable standard of review in ruling on a motion for new trial is whether the trial court abused its discretion. Campbell v. Tork, Inc., 03-1341 (La.2/20/04), 870 So.2d 968, 971.
USSA asserts that the jury found Peter failed to prove he suffered a nerve injury as a result of the accident. State farm responds that there is ample evidence in the record to support the jury's award. Among other things, it points to the following evidence. Peter had long gaps in treatment. Doctors reported significant improvement, good range of motion, no atrophy and no weakness. Peter engaged in sports activities after the accident. He put off having surgery for years. State Farm also argues that the jury's award was based on the fact there were serious causation issues as to when the nerve problem occurred in the shoulder.
*812 Peter testified he has had pain and restricted movement of his arm. Pain waxed and waned as he used the shoulder. The more he used it, the more it hurt and the more anti-inflammatories he would take. He stated that certain activities cause him pain. He does a number of activities by keeping his arms low. If he places his arms up in the air (90 degrees above) or if he is pushing things out with his hand, it gives him problems. Even at the time of trial, if he attempted to change a light bulb, he would still have pain and would not be able to do it.
Peter testified that from the accident on February 16, 1999 until the marriage on June 12, 1999, he did not resume any of his sports activities. The evidence at trial establishes that with the exception of this period, Peter resumed sports activities, which included snow skiing, jogging, biking, and soccer. Furthermore, Peter was able to successfully complete medical school and he was in his second year of residency. Peter testified that in medicine complaining is a sign of weakness. With the exception of the chief resident, Peter never told anyone in medical school or his training programs that he had any physical problems.
Renee testified that they did not take a honeymoon in 1999 right after the wedding. After the first year of medical school, however, they went to Europe. In the third year of medical school, they went to Cancun for a week. In the fourth year, they went to Disneyland.
The evidence at trial showed there were long gaps in treatment and there was a significant delay in Peter's having the recommended arthroscopic surgery. Peter testified that he guessed the reason he did not seek treatment about five months from April to October of 1999 was because there was nothing new. In 2003, when doctors recommended arthroscopic surgery, he waited until 2005 because there was no guarantee and he hoped the nerve would regenerate. Furthermore, at times, his father treated him by prescribing sample medications as well as over-the-counter medications. He arrived for the residency program at the University of Colorado in July 2004 a month earlier than the program in order to find a place to live. From that time, other than his father, Peter did not see any doctor until he saw Dr. McCarty on February 16, 2005. He had scheduled visits with Dr. McCarty that he had to cancel because he was unable to leave the hospital.
When asked to account for the period of non-treatment, that is, from Dr. Bigliani in December 2001 to Dr. McCarty in February 2005 with only one visit to Dr. Sellards on April 23, 2003, Peter explained he knew his doctors' evaluation.
Dr. Robert D'Ambrosia testified he briefly examined Peter the day of the accident. He did not open a medical file on him. He gave him anti-inflammatory medication and recommended strengthening exercises. He saw Peter about 50 times in 1999 at his home for dinner or family gatherings. During that time, Dr. Robert D'Ambrosia did a couple of exams. He had no records of those visits. During the years of 1999 to 2002, he would occasionally examine Peter. In 2004, Dr. Robert D'Ambrosia traveled back and forth to New Orleans and he saw Peter fairly frequently. He stated he never saw Peter as a patient directly. He mostly saw him as a concerned father. He never took notes of those visits.
The jury heard extensive testimony regarding whether Peter had atrophy or weakness of the muscles as a result of nerve injury.
Dr. Robert D'Ambrosia testified that with a nerve injury, muscle weakness does *813 not become evident until a minimum of six weeks. Furthermore, since the muscle is under the scapula, muscle atrophy is not apparent. He stated that Peter's serratus muscle was not normal because there was winging. Dr. Carson explained that winging of the scapula occurs when one or more muscles are not functioning well.
According to Dr. Carson, he found that with the exception of the supraspinatus muscle group, Peter's strength about the muscle of the shoulder was otherwise normal. In April 1999, he saw no atrophy of the muscle groups. It would take several months to see a loss of muscle tone. As the muscle deteriorated, the shoulder problem would potentially become worse.
In 2001, however, Dr. Cazale did not find any significant atrophy in Peter's examination. He could not detect any weakness on manual testing of muscles of the right upper extremity. He could not reproduce any instability. But in trying to stretch Peter's arm, there was a positive apprehension sign when Dr. Cazale brought his arm up into abduction external rotation. This is a subjective test where the patient tightens and won't allow the shoulder to move further.
Dr. Cazale explained that the thoracic anterior muscle is not visible. Thus, atrophy is not evident. Still, atrophy could be implied because of the winged scapula.
Dr. Sumner testified that the long thoracic nerve is the nerve supply to the serratus anterior. This muscle is deep underneath the shoulder blade and it wraps around the chest wall. When Dr. Sumner examined Peter in 2001, there was no noticeable weakness and Peter's reflexes were normal. He stated, however, that it was obviously contradictory to say that his muscles that fixed the scapula were normal strength. If so, he would not have had a winged scapula. In 2001, he noted on Peter's second examination mild atrophy of the right upper trapezius. He did not note this atrophy on the first exam. But atrophy is a delayed response to nerve injury-it is not immediate. He suspected that because Peter was physically active that atrophy largely reversed itself but he has not re-evaluated Peter.
In 2001, Dr. Drez did not note any atrophy or weakness in the shoulder.
Dr. Martin testified that with a nerve injury, the muscle atrophy occurs over a few weeks. If there is no atrophy of a muscle after a nerve injury it signifies the injury was fairly mild or that the nerve has recovered and is now working well again. In 2003, he saw no muscle atrophy. He could detect no weakness or atrophy of the trapezius muscle. He tested several muscles for strength of the right upper extremity. The tests were normal. Many people with winging have no pain so Dr. Martin was not certain if Peter's pain was due to winging.
The jury heard the witnesses and evaluated the loss based on the evidence presented. It apparently determined that the injury did not significantly impair Peter's performance as a medical student or resident. The evidence shows that Peter was able to perform duties as a medical doctor. In fact, he performed at a high level of success. Furthermore, although Peter testified he no longer engaged in sports activities to the full extent that he enjoyed prior to the accident, he continued to participate in sports activities. He explained that he has not attempted to ski difficult runs because he would be afraid of falling. He also testified he went on a non-strenuous rafting (tubing) trip while in Colorado. Furthermore, the jury heard testimony regarding the lapse in treatment and conflicting testimony regarding muscle weakness or atrophy. After reviewing the record, we find that there is a reasonable *814 factual basis for the award, and it is not clearly wrong nor manifestly erroneous. It is not our function to reweigh or reevaluate the evidence and we will not. Indeed, in reviewing general damages, "the discretion vested in the trier of fact is `great,' and even vast, so that an appellate court should rarely disturb an award of general damages." Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La. 1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994). "Reasonable persons frequently disagree about the measure of general damages in a particular case." Id. "It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award." Id.
Although Peter cites a number of cases illustrative of higher general damages awards for allegedly comparable injuries, as we discern no abuse of discretion, it is inappropriate and unnecessary for us to undertake a comparison of the award in this case with past awards. Each case is different, and the adequacy or inadequacy of the award should be determined by the facts or circumstances particular to the case under consideration. See: Youn, supra, 623 So.2d at 1260. Accordingly, we find nothing manifestly erroneous nor clearly wrong with the trial court's failure to grant a JNOV. Likewise, we find no abuse of discretion in the failure to grant a new trial. We find the jury exercised reasonableness in its determination of general damages. We therefore find the trial court's denial of the alternative Motion for Additur to be proper.

FUTURE MEDICAL EXPENSES
State Farm and USAA argue that the jury erred in awarding $15,000 for future medical expenses. They assert that the evidence and testimony at trial indicated that the need for future surgery was speculative. On the other hand, Peter asserts that the jury was not manifestly erroneous in awarding this amount based upon Dr. McCarty's testimony that it was more probable than not that Peter would require another arthroscopic surgery in the future costing between $12,000 to $15,000 or around $20,000 for debridement of scar tissue. In addition, Dr. Carson recommended a muscle transfer surgery for the winging. The arthroscopic surgery would not address the winged scapula. Although Dr. McCarty testified he did not have a crystal ball, he could certainly say that Peter will require the arthroscopic surgery. Furthermore, the defendants presented no evidence to the contrary.
The defendants argue on appeal that Dr. McCarty changed his position shortly before trial but Peter disagrees.
Future medical expenses, as special damages, must be established with some degree of certainty, and a plaintiff must demonstrate that such expenditures will, more probably than not, be incurred as a result of the injury. Harvin v. ANPAC Louisiana Ins. Co., 06-204 (La.App. 5 Cir. 10/17/06), 944 So.2d 648, 655, writ denied, 06-2729 (La.1/8/07), 948 So.2d 134 (citation omitted). The plaintiff bears the burden of proving entitlement to future medical expenses by a preponderance of the evidence. Id. Awards will not be made in the absence of medical testimony that they are indicated and setting out their probable cost. Id. Credibility determinations are for the trier of fact, even as to the evaluation of expert witness testimony. Green v. K-Mart Corp., 03-2495 (La.5/25/04), 874 So.2d 838, 843. A fact-finder may accept or reject the opinion expressed by an expert, in whole or in part. Id. (citation omitted).
*815 USAA argues Peter must prove the surgery was "inevitable," relying on Gunn v. Robertson, 01-347 (La.App. 5 Cir. 11/14/01), 801 So.2d 555, 564, writs denied, 02-0170, 02-0176 (La.3/22/02), 811 So.2d 942. In Gunn, this court relied on Hurts v. Woodis, 95-2166 (La.App. 1 Cir. 6/28/96), 676 So.2d 1166, 1177, which stated that the plaintiff must prove that these expenses will be necessary and inevitable. The statement in Gunn stems from a pronouncement in the 1992 Louisiana Supreme Court case of Stiles v. K Mart Corp., 597 So.2d 1012 (La.1992) (per curiam). Recently, this court explained that the burden of proving entitlement to future medical expenses is by a preponderance of the evidence. Dufrene v. Gautreau Family, LLC, 07-467 (La.App. 5 Cir. 2/22/08), 980 So.2d 68, 82.[5] The court cited Stiles, 597 So.2d at 1013, for the following proposition:
When the record establishes that future medical expenses will be necessary and inevitable, the court should not reject an award of future medical expenses on the basis that the record does not provide the exact value of the necessary expenses, if the court can examine the record and determine from evidence of past medical expenses and other evidence a minimum amount that reasonable minds could not disagree will be required. La.C.C.P. art. 2164.
By reaffirming the "preponderance of evidence" standard, Dufrene did not indicate that the Louisiana Supreme Court in Stiles intended to change the standard for determining entitlement to future medical expenses.
Thus, we hold that the plaintiff bears the burden of proving entitlement to future medical expenses by a preponderance of the evidence.
Dr. Robert D'Ambrosia testified that he would defer to Dr. McCarty regarding Peter's prognosis since Dr. McCarty was the last doctor to examine Peter.
Dr. McCarty testified that he thinks there is a very good probability that Peter will need future additional surgery because on his last exam he did have some posterior pain. He may have scar tissue that is built up. And, he may need a muscle transfer for the scapula issue. There is a good likelihood or reasonable medical probability that Peter will need surgery in the futurepossibly debridement of the shoulder. He bases the need for additional surgery on Peter's January 4, 2006 examination. He estimated that if Peter has to undergo arthroscopic surgery in the future it would cost around $20,000 or between $12,000 to $15,000 based on surgical and hospital fees.
During cross-examination, he was asked about his report of January 4, 2006 where he wrote it was unknown whether any future problems might arise. When asked why now four days before trial he testified Peter will likely have future problems, he said it was unknown but if it was stated in medical-legal terms, he would say it was a probability. He explained he did not know for certain but if the lawyers had to hear it one way or the other, he had to say there was a probability it would be necessary.
The jury evidently accepted Dr. McCarty's testimony that he could still say that there was a probability surgery would be necessary. Given the uncontroverted testimony regarding the medical probability of future surgical intervention, we cannot say that the jury's award of future medical expenses was unreasonable and clearly wrong. Accordingly, we find no merit to the assignment.

*816 LOSS OF FUTURE EARNING CAPACITY
A plaintiff is allowed to recover for loss of earnings and earning capacity. Hobgood v. Aucoin, 574 So.2d 344, 345 (La.1990). Earning capacity in itself is not necessarily determined by actual loss; damages may be assessed for the deprivation of what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. The theory is that the injury has deprived the plaintiff of a capacity he would have been entitled to enjoy even though he never profited from it monetarily. Folse v. Fakouri, 371 So.2d 1120, 1124 (La. 1979).
To obtain an award for future loss of wages and/or loss of earning capacity, a plaintiff must present medical evidence which indicates with reasonable certainty that there exists a residual disability causally related to the accident. Aisole v. Dean, 574 So.2d 1248, 1252 (La.1991) (citations omitted).
According to Peter, he was able to perform the duties of a first year resident. During that year, he spent little time assisting in surgeries.
As a second year resident, he started performing surgery, spending about 40 hours a week in the operating room. At the time of trial he had only been doing orthopedics for six months. He has problems with pain when he has to hold his arms out in front of him. A normal surgery day is 10 hours and if on call, he could spend the entire night in the operating room.
Dr. Robert D'Ambrosia explained that Peter would have problems with activities of pushing forward and holding his arms above 90 degrees in surgery. Upon entering the operating room, a surgeon's hands must remain above chest level (above 90 degrees) the entire time.
Peter testified that he has had difficulty using a saw during surgery. On one occasion, he unsuccessfully attempted a hip relocation in the emergency room. He had an emergency room physician take over. On another occasion, he could not do a hammering procedure with his right arm. He had to start hammering with his left hand. He described other surgeries where he also compensated by switching positions or using the other arm, such as when surgically dislocating a hip, and placing screws in an open pelvis. Thus far, he has been able to do the surgeries assigned to him. He just has trouble doing them. But after fixing a pelvis and other surgical activities he was in pain. Pain was worse some weeks than others.
The jury heard the following conflicting medical testimony regarding whether Peter has a permanent functional impairment of his shoulder that would result in loss of future earning capacity in performing the duties of an orthopedic surgeon.
According to Dr. Carson, based on the last time he saw Peter in May 2000, there was probably nothing to prevent him from doing what was required of a medical student. But there was a fair amount of lifting and heavy activity involved as an orthopedic surgeon and those activities might hinder him. The winging would not preclude Peter from going into orthopedics. He might have to adjust and compromise in doing different things. For things that involve endurance, such as reducing a hip dislocation, a surgeon needs an adequate shoulder. This may not be the easiest thing to do with his shoulder. Considering Peter's injury, there is a potential that certain procedures of an orthopedic surgeon would be a problem but he could not say definitelyjust potentially.
*817 Dr. Drez testified that based on his exam in April 2001, Peter might not have been able to do certain duties of an orthopedic surgeon, such as using a hammer, pounding, or pulling on structures to reduce a dislocated shoulder or dislocated hip.
Dr. Cazale has performed hip and knee replacements. He believed that more probable than not, Peter would be able to perform the duties of orthopedic surgery. He found on exam that Peter was a fairly fit individual. Based on his exam, testing, and finding normal strength, there was nothing that would suggest to him that Peter would be unable to do any of the functions of an orthopedic surgeon. Someone with a winging condition could still have a functional shoulder. But he would defer to Dr. McCarty who treated Peter last.
Dr. Martin testified that subsequent exams have shown full range of motion with no weakness. Although Peter still shows some weakness of the scapula, he has a good functional recovery. The recovery is not 100% because he still has winging. But from reading depositions of doctors who saw him recently, Peter has full range of motion and no weakness and seems to have a good functional recovery.
Dr. Robert D'Ambrosia testified that Peter has limitations based on his injuries. He will have problems with any type of abduction or overhead function of the arm. He could also get chronic impingement problems that would require further surgery. This limitation would affect his ability to perform surgeries.
He noted that after surgery, Peter had better stability of the shoulder. Peter only had surgery a few months before trial. It was too early to tell whether the condition of Peter's shoulder would affect Peter's work or his ability to perform the duties of an orthopedic surgeon. He stated, however, that he would defer to the professionals who were treating Peter. In particular, he would defer to Dr. McCarty regarding Peter's prognosis since Dr. McCarty was the last doctor to examine Peter.
Dr. McCarty gave Peter an anatomical impairment of 15% of upper extremity permanent impairment and 9% whole body impairment. Dr. McCarty, however, did not take pain in consideration. He further testified he had no knowledge that Peter ever had a functional capacity examination. Dr. McCarty stated that it was more likely than not that Peter's injuries resulted from the trauma of the February 1999 accident. He thought the injuries would probably give him some problems in the future. Peter is very muscular and is doing very well in compensating but he is very young. As he ages, the problems with his scapula will become more of an issue. More probably than not Peter will have some future problems in performing his duties as an orthopedic surgeon.
Dr. McCarty thought Peter was able to perform most duties required in his second year of residency. After June 29, 2005, he saw Peter two or three times during residency conferences and Peter did not mention any problems. Dr. McCarty noted in January 4, 2006 that Peter was in his second year of surgical rotations and was participating in all activities and compensating well overall. In his deposition of December 20, 2005, he said based on his exam of June 29, 2005 Peter should be able to perform most duties of an orthopedic resident. He still believed this was true as of January 26, 2006. Peter has been able to adapt and do the maneuvers that are a little more difficult for him. Someone with a problem with the scapula and muscles around the scapula would within a reasonable degree of medical certainty expect *818 some problems with heavy procedures in the future, as the person ages.
The jury awarded $100,000 for this item of damages. In these cross-appeals, the defendants argue the record does not support an award of loss of future earning capacity[6] while the plaintiff argues the trial judge should have granted his motion for additur and increased the award. For the reasons that follow, we find the jury was not manifestly erroneous nor did it abuse its discretion in awarding $100,000.00.
State Farm and USSA argue the plaintiff must present economic evidence to calculate present value. State Farm argues there was no evidence to support the $100,000 award, particularly since it is unknown when Peter will begin working. The defendants rely on Kugler v. Tangipahoa Parish School Bd., 99-0016 (La.App. 1 Cir. 2/18/00), 752 So.2d 375, 381.
In Kugler, the First Circuit found the trial judge did not err in failing to award the plaintiff loss of earning capacity. A vocational rehabilitation expert presented models, which were based on assumptions not supported by medical testimony. In addition, the expert offered dollar amounts based on projections into the future, but the court noted that the expert was not an economist. The court found that since the plaintiff admitted she would not enter the labor force for six years, any attempt to predict what she would be capable of earning six years into the future over her remaining 18-year work life would be speculative at best. Thus, the judge did not err in rejecting the figures propounded by the expert for loss of earning capacity. Id.
We find Kugler is factually distinguishable. In this case, Peter presented evidence that he intended to pursue a career as an orthopedic surgeon, was pursuing an education necessary to that career, and he was capable of obtaining credentials of an orthopedic surgeon. Furthermore, the Louisiana Supreme Court has permitted an award for limitation and/or loss of vocational opportunities based on the testimony of doctors without the testimony of vocational and economic experts. Theriot v. Allstate Ins. Co., 625 So.2d 1337, 1343-44 (La.1993). We find Theriot controls. Additionally, Mr. Meunier testified that no matter when Peter entered the work force, he would still have a shortened work life.[7]
USSA argues that this court in Fleming v. Smith, 93-488 (La.App. 5 Cir. 5/31/94), 638 So.2d 467 requires economic evidence.
Fleming is distinguishable. There, the plaintiff sought damages for loss of earning capacity/future lost wages. The jury awarded nothing for the alleged loss and this court found no abuse of discretion. In that case, the plaintiff had returned to his job. His income significantly increased from that of the previous year. There was medical testimony that the 31-year-old plaintiff had a 6% impairment due to a continuing knee problem. His chances for needing knee replacement surgery after *819 the age of 50 were dramatically increased as a result of the injuries in the accident. Such surgery would restrict the plaintiff to more sedentary work. However, there was no testimony nor evidence to prove how this would impact on the plaintiffs income 30 years into the future. This court found that there was also no "evidence of work life expectancy, economist testimony, etc." Fleming, supra, 638 So.2d at 471, 472, 473.
In contrast, unlike Fleming, there was ample medical testimony and vocational evidence before the jury to support the award of loss of future earning capacity. The testimony of an economist is entitled to weight, but since it is necessarily based on uncertain future events, it is not conclusive. Doss v. Second Chance Body Armor, Inc., 34,788 (La.App. 2 Cir. 8/22/01), 794 So.2d 97, 102 (citation omitted).
State Farm and USSA also argue there was no medical testimony to support Peter's claim because there was no functional capacity testimony and Mr. Meunier did not do a functional capacity evaluation. They assert that Peter is performing his duties without any problems reported to his supervisors. And, there was no testimony he cannot function in another field of orthopedic surgery.
Mr. Meunier did not perform a functional capacity evaluation. Instead, he reviewed doctors' reports and depositions regarding Peter's functional limitations. Mr. Meunier's assumptions were not based on erroneous information. There was medical testimony, which apparently was accepted by the jury, that demonstrated a functional disability in performing the duties of an orthopedic surgeon. In order to recover damages for loss of earning capacity, the plaintiff need not be working or even in a certain profession to recover; what is being compensated is his lost ability to earn such an amount and he may recover such damages even though he may never have taken advantage of that capacity. Hobgood v. Aucoin, 574 So.2d 344, 346 (La.1990). Furthermore, Mr. Meunier testified that based on the medical reports concerning Peter's limitations in performing the full range of surgeries of an orthopedic surgeon, Peter has a non-severe work disability. This results in either 5.8 years reduced work life or 15% reduced wages. The jury heard uncontroverted evidence regarding Peter's work disability. Thus, we find no manifest error in the jury's concluding that Peter sustained a loss of future earning capacity.
In the case at bar, evidence was introduced that Peter's ability to perform surgeries during his residency is restricted because of the pain which resulted from the aggravation of the injury. This was competent evidence of the probable impairment of future earning capacity. Therefore, despite USSA's and State Farm's argument to the contrary, the trial judge properly instructed the jury as to the plaintiffs right to recovery for loss of future earning capacity. Thus, the trial judge did not err in including this item of damages.
There was ample evidence that Peter intended to pursue a career in orthopedic surgery, a career which by necessity would require mobility of his shoulder. Moreover, although Peter was not yet a medical student at the time of the accident, his goal before then was to become an orthopedic surgeon. He showed a clear interest in, and aptitude for, becoming an orthopedic surgeon. There was medical testimony that Peter has physical limitations preventing him from effectively functioning in his chosen career because of the injuries sustained in the accident. In addition, Peter also presented the testimony of an expert who gave an opinion concerning the reduction in his work-life expectancy, or *820 the reduction in his future earnings, due to his functional restrictions. These physical restrictions create a reasonable inference that Peter's future earning capacity will be impaired.
The jury could have reasonably found from the medical testimony that Peter's ability to reach his full earning potential as an orthopedic surgeon was diminished due to the injury caused by the accident. There was medical testimony that certain operative procedures would be more difficult for him, especially as he ages, and that he would have to compensate for his limitations.
Peter argues here that the trial judge should have granted his motion for additur and awarded $232,000 allegedly based on Peter's $40,000 salary as a resident with a projected calculated loss of 5.8 years of work life, discounted to present value.[8] At the post-trial motion hearing, USSA responded that the income tax returns in the record were irrelevant since the plaintiff was seeking instead a loss of future earnings capacity based on Peter's eventual employment as an orthopedic surgeon. We conclude that Hobgood governs. There the court held: "While [a] plaintiffs earning capacity at the time of the injury is relevant, it is not necessarily determinative of his future ability to earn." Hobgood, supra, 574 So.2d at 346. "Damages should be estimated on the injured person's ability to earn money, rather than what he actually earned before the injury." Id.
Furthermore, in Viator v. Gilbert, 253 La. 81, 216 So.2d 821, 822-23 (1968), the Louisiana Supreme Court opined: "the settled jurisprudence of this Court [is] that allowance of monetary damages for loss of future earnings ... cannot be calculated with mathematical exactitude; that they are speculative in character and the most that the courts can do is to exercise a sound judicial discretion and award such amount as, all the circumstances considered, may seem just to both litigants and not unduly oppressive to either." Id., (citations and internal quotations omitted).
Given the speculative nature of this type of award, we cannot say that the jury was manifestly erroneous nor did it abuse its discretion in awarding $100,000.00.

INTEREST
Peter claims that the trial court erred in interest calculations on the judgment.
The parties stipulated outside the presence of the jury that the defendants were entitled to a credit of $45,451.05 as the amount previously paid to Peter. They stipulated this amount was a result of injuries sustained in the accident at issue and represented the amount paid by State Farm as Lang's liability carrier and the medical payment covered under Gerald Arceneaux's UM policy with USAA. No evidence was introduced regarding the settlement and the parties did not stipulate that Peter reserved his right to judicial interest on the amount paid. The trial judge rendered judgment deducting the credit from the total amount awarded and awarded interest on the net amount. State Farm and USAA respond that Peter is not entitled to interest on the paid amounts as he failed to show he reserved this right. We agree.
In Sutton v. Oncale, 99-967 (La.App. 5 Cir. 3/29/00), 765 So.2d 1072, 1076, this court held that the UM carrier was liable for judicial interest on the amount paid by the tortfeasor's liability insurer, where the insured compromised the tort claim and reserved her right to judicial interest on *821 the tortfeasor's obligation. In that case, Ms. Sutton reserved her right to interest pursuant to former La.C.C. art. 2925. Present Article 2913 reproduces the substance of Article 2925. It provides: "When the principal of the loan is released without reservation as to interest, it is presumed that the interest is also released." In this case since there was no evidence of a reservation as to interest, the presumption applies. Compare: Martin v. Champion Ins. Co., 95-0030 (La.6/30/95), 656 So.2d 991, 999. Accordingly, we find no error in that portion of the trial court judgment failing to award judicial interest on the entire judgment.

DECREE
For the reasons stated herein, the judgment of the district court is affirmed.
AFFIRMED.
NOTES
[1] Before trial, the trial judge granted Peter's partial summary judgment on the issue of liability. At trial, the parties stipulated as follows. Lang was 100% at fault for the accident that occurred on February 16, 1999. Gerald Arceneaux, the driver of the suburban in which Peter was a passenger, was not at fault in causing the accident at issue.
[2] Peter points to cases for the proposition that testimony of a vocational expert alone is sufficient to prove loss of future earning capacity. Those cases are inapposite because this issue was not raised on appeal. Thus, the courts did not consider the issue presented here. These cases are: Knabel v. Lewis, 00-1464 (La.App. 1 Cir. 9/28/01), 809 So.2d 314, writ denied, 01-2892 (La.3/8/02), 811 So.2d 886; Istre v. Bratton, 94-1182 (La.App. 3 Cir. 3/8/95), 653 So.2d 1205, writ denied, 95-0905 (La.5/12/95), 654 So.2d 1088; Dabog v. Deris, 92-590 (La.App. 5 Cir. 3/29/94), 636 So.2d 994.
[3] In this case, the jury was given an instruction that it was to determine the amount of loss of future earning power and/or loss of earnings by considering, among other things, "the present value of any loss of future earning power."
[4] The parties had stipulated to the records' authenticity but the defendants disputed their relation to the accident.
[5] On March 20, 2008 a writ was filed with the Louisiana Supreme Court, No. 2008-C-628.
[6] USSA mentions there was a discovery violation regarding Mr. Meunier because Mr. Meunier gave a new opinion the weekend before trial, which violated the court's cutoff order. It asserts that the trial court erroneously overruled the defense objection. USSA has not assigned nor has it briefed the issue. Thus, we consider any alleged issue regarding a discovery violation abandoned. See: Uniform Rules, Courts of Appeal, Rule 2-12.4; Silbernagel v. Silbernagel, 06-879 (La.App. 5 Cir. 4/11/07), 958 So.2d 13, 20.
[7] We also find that USSA's reliance on Naman v. Schmidt, 541 So.2d 265, 269 (La.App. 4 Cir. 1989) is misplaced. In that case, unlike the case at bar, the court concluded that the plaintiff's failure to return to work could just as easily have been caused by the fact that no work was available.
[8] We note that present value tables were not introduced at trial.